**UNITED STATES of America,**
**Plaintiff,**

**v.**

**UNITED TECHNOLOGIES, CORP.,**
**SIKORSKY AIRCRAFT DIVISION,**
**Defendant.**

**No. 5:92-CV-375 (EBB).**

United States District Court,
D. Connecticut.

June 7, 1999.

Alan M. Soloway, Asst. U.S. Attorney, U.S. Attorney's Office, New Haven, CT, Russell B. Kinner, U.S. Department of Justice, Washington, D.C., for plaintiff.

James T. Cowdery, Steven David Ecker, Cowdery & Ecker, Hartford, CT, Richard L. Beizer, Clinton L. Gardiner, Jeffrey E. Greene, Elizabeth L. Pearl, Crowell & Moring, Washington, D.C., for defendant.

## OPINION

ELLEN B. BURNS, Senior District Judge.

Plaintiff, United States of America, has brought this action against Defendant, United Technologies Corporation, Sikorsky Aircraft Division ("Sikorsky"), alleging violations of the False Claims Act, 31 U.S.C. § 3729 ("FCA"), and the Truth–in–Negotiations Act, 10 U.S.C. § 2306a ("TINA"). The government also seeks damages under the common law causes of action of payment by mistake and unjust enrichment.

In its amended complaint, the government alleges that Sikorsky submitted false cost or pricing data to the Navy during negotiations and provided a false statement in the company's July 25, 1985 Certificate of Current Cost or Pricing Data that accurate, current and complete cost or pricing data had been provided to the Navy through the agreement date of July 9, 1985.

In accordance with Federal Rule of Civil Procedure 52(a), the Court now enters the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

A. *Background*

1. On or about January 13, 1984, the Navy awarded contract N00019–83–C–0364 ("Contract") to Sikorsky. (EX. 501.) The purpose of the Contract was to extend the service life of the Navy's SH–3 Sea King helicopter. This effort became known as the Main Gear Box Improvement Program ("MGBIP").

2. The Contract references, and is governed by, clauses in the Defense Acquisition Regulation ("DAR"), including DAR § 7–104.29(a) (January, 1970), Price Reduction For Defective Cost or Pricing Data. (EX. 501 at 8–12.)

3. Modification P00001 to the Contract was executed by the Navy on March 13, 1984. Among other things, Modification P00001 required Sikorsky to furnish main gear box improvement kits for aircraft, for training and for spares. Because there were several versions of the Sea King helicopter in service, the modification kits had to be customized in order to upgrade the various model's main gear boxes. The price for P00001 was undefinitized, meaning that it was to be negotiated at a future date.

4. On or about September 2, 1984, the Navy executed a second undefinitized modification to the Contract, Modification P00004. Inter alia, Modification P00004 changed Contract Line Item Number ("CLIN") 0028 to increase the quantity of main gear box improvement kits for the H–3 version of the Sea King helicopter from 62 to 80, and directed delivery of quantities of kits for spares.

5. On or about May 22, 1985, the Navy executed another undefinitized modification, P00008, which, inter alia, altered the quantities of kits needed under the Main Gear Box Improvement Program ("MGBIP").

6. The total price for the main gear box improvement kits and interim spares purchased through Modifications P00001, P00004 and P00008 was definitized in Modification P00013. Modification P00013 was signed by Sikorsky on October 9, 1985, and by the Navy on January 17, 1986. (EX. 26.) Modification P00013 was entered into

on January 17, 1986. The issuance of Modification P00013 was preceded by Sikorsky's submittal of price proposals and cost information in support of those proposals, and by lengthy negotiations between Sikorsky and the Navy. With respect to the kits and interim spares, those negotiations concluded on July 9, 1985.

B. *Sikorsky's proposals and submissions*

7. On or about May 14, 1984, Sikorsky submitted to the Navy proposal number SPB 84–N3247 to definitize P00001. That proposal included amounts for FY 1984 main gear box improvement kits and for interim spares. Sikorsky submitted with the proposal a DD Form 633, a Contract Pricing Proposal cover sheet. (EX. 73.)

8. On or about May 17, 1984, at the Navy's request, Sikorsky submitted another proposal, SPB 84–N3248. This proposal included amounts for main gear box improvement kits and interim spares for FY 1985 and FY 1986 and also included a DD 633. (EX. 74.)

9. Sikorsky did not submit with its proposals a consolidated, priced bill of materials listing, by part number, all of the components required for the contract. At the time of these negotiations, Sikorsky's computer system did not accommodate the creation of such consolidated bills of materials. Sometime in late 1984, Robert Yates, the Navy's primary negotiator on the MGBIP, learned of this limitation in Sikorsky's computer system. (TR. 1852.) Sikorsky provided to Yates handwritten bills of materials for each of the subkits. (TR. 1822; EX. 510.)

10. On July 18, 1984, Sikorsky submitted to the Navy a seven-page, handwritten "Unique Parts List" which gave for each of the parts listed a part number, description, quantity, unit price and total price. (TR. 927; EX. 512.)

11. On August 16, 1984, representatives of the Navy and Sikorsky met to discuss the Navy's concern regarding the proposed prices Sikorsky had furnished with its May, 1984, proposals for subcontracted items on the MGBIP. As a result of that meeting, Sikorsky was to provide, on hard copy and diskette, the price history for all items with unit costs over $100. (EX. 101.)

12. On October 11, 1984, the Defense Contract Audit Agency ("DCAA") issued Audit Report No. 2661–4B210204, discussing the findings from a pre-award assist audit of Sikorsky's proposals. (EX. 511.) In performing the review, DCAA examined Sikorsky's handwritten bills of materials for the subkits. In the report, DCAA recommended "that the contractor be required to resubmit its proposed material costs for our review prior to contract negotiations." (EX. 511 at 11.)

13. Sikorsky employee Robert Madden was the primary negotiator on behalf of Sikorsky for the definitization of the kits and interim spares portion of the MGBIP. Stephen Kiesel, another Sikorsky employee, assisted Madden in the negotiation process.

14. In keeping with its then current practice, Sikorsky assigned a person in the Pricing, Targeting and Termination Liability unit of the Purchasing Department to act as a liaison between that department and Sikorsky's government contract negotiators. Dennis Buccilli was assigned to support the Sikorsky negotiators. His job was to gather and organize information from the Purchasing Department for Sikorsky to use and to pass on to the government. (TR. 381–82, 388–90, 404, 481–82.)

15. As part of his duties, Buccilli would solicit buyers, who were not typically informed when negotiations were taking place with the government (TR. 185), to obtain the most current pricing information for incorporation into Purchasing Updates. Buccilli would gather this information in various ways: (1) by delivering lists of parts specific to buyers and purchasing agents of each buying group for updating, (2) by checking the Sikorsky computer sys-

tem which displayed information regarding purchase orders ("PRISM"), and (3) sometimes by speaking with buyers in person. (TR. 481–82, 490–91, 546, 583.)

16. Upon receipt of this information, Buccilli incorporated it into a Purchasing Update, which he then forwarded to Sikorsky's negotiators. (TR. 476–77, 481, 486–87.) During the final stages of the negotiations, Buccilli highlighted changes from the previous version. (TR. 592, 1418, 1482–83, 1974.)

17. On or about January 3, 1985, Sikorsky delivered a Purchasing Update, dated January 2, 1985, to the Navy. (EXs. 95; 522.)

18. On or about January 22, 1985, Sikorsky provided the Navy with a "Program Update," which set forth proposed pricing for the entire MGBIP as then contemplated, except for the warranty and the interim spares. (EX. 543.)

19. On or about April 23, 1985, Sikorsky submitted to the Navy a second comprehensive Program Update dated April 20, 1985, ("April 20 Program Update") covering all aspects of the MGBIP, except for warranty. (TR.1945–46.) This update also covered the interim spares. Regarding program material costs, this Program Update included Shop Fabricated Spares Cost Worksheets of various subkit configurations and listings maintained on a personal computer spreadsheet of the parts for certain other subkits to be purchased by the Navy. This Program Update also contained listings of interim spares maintained on a personal computer. These worksheets and listings were essentially priced bills of materials for each of the subkits and for the interim spares the Navy was considering. The April 20 Program Update also included material cost summary pages for each of the fiscal years subject to the negotiations. These summary pages contained information regarding the quantity of each of the subkits that the Navy was considering buying for each of the three fiscal years, 1984, 1985 and 1986. (EX. 6.)

20. Yates understood that, in order to determine Contract quantities of a particular part by using the April 20 Program Update, one would first look to the bills of materials for an individual subkit to get a per-subkit quantity and then look to the material summary pages to determine how many of that type of subkit were being purchased. Then the two numbers would be multiplied together to determine the total for the part. (TR. 1853–55.)

21. On or about May 6, 1985, Sikorsky delivered to the Navy a Purchasing Update. (EX. 98.)

22. On or about May 15, 1985, Sikorsky delivered to the Navy another Purchasing Update. (EX. 99A.)

23. On or about June 26, 1985, Sikorsky delivered to the Navy a Commitment Report for special project codes 3F and DG dated June 19, 1985. (EXs.110, 540.)

24. On or about June 28, 1985, Sikorsky delivered to the Navy a Purchasing Update dated June 27, 1985. (EXs.111, 532.)

25. On July 8, 1985, Sikorsky delivered to the Navy a Commitment Report for special project codes 3F and DG dated June 27, 1985. (EX. 541; TR. 859–60, 1952–53.)

26. On July 25, 1985, Sikorsky forwarded to the Navy a Commitment Report for special project codes 3F and DG dated July 10, 1985, and containing data concerning purchase orders placed as of July 9, 1985. (EX. 551.)

C. *Negotiations and agreement on price*

27. In late November, 1984, in preparation for negotiations, Yates visited the Sikorsky plant and met with government and Sikorsky personnel. (TR. 1663–64.) At that time, Yates was given a copy of a Commitment Report and an explanation of how to read it. (TR. 1851–52.)

28. On or about March 11, 1985, Yates completed a prenegotiation Business Clearance Memorandum ("BCM"). Upon approval by higher ranking Navy officials,

the BCM authorized Yates to definitize the pricing of Sikorsky's Engineering Change Proposal 5923R1 to Contract N00019–83–C–0364, the MGBIP. The BCM set out a target price of $36,847,629, excluding warranty. (EX. 103.)

29. In its pre-award assist audit report, DCAA recommended that the Navy have an auditor attend the negotiations due to their complexity. Yates did not follow this recommendation. (TR. 1835.)

30. Also in the pre-award assist audit report, DCAA offered to assist the Navy at any time during the negotiations. DCAA provided the name and telephone number of a person to contact for assistance who would always be available to the Navy negotiator. Despite this, Yates contacted DCAA only to discuss the applicability of factors for scrap, raw, and unrestricted material. Yates did not request the assistance of DCAA in analyzing the cost or pricing data Sikorsky submitted. (TR. 1836–38.)

31. DCAA also recommended in the pre-award assist audit report that additional audit support should be requested if there were significant changes in the planned procurement or if Sikorsky supplied cost or pricing data which had a significant impact on the proposal. Both of these eventualities came to pass; however, Yates did not request such assistance. (TR. 1838–39.)

32. The parties engaged in negotiations to definitize the MGBIP (exclusive of warranty) from April, 1985, through July 9, 1985. Face-to-face negotiations occurred on April 1, April 23, April 24, May 7, May 14–16, June 4, June 24 and June 26–28, 1985. (TR. 625, 629, 718, 721–22, 734, 749, 825, 844–50.) Sikorsky's negotiation team included Madden and Kiesel, among others. (TR. 621.) The Navy was represented by Yates, who was assisted by Thomas Bordone. (TR. 625.)

33. The negotiations became extended over the issue of what factors Sikorsky was to apply to scrap, raw or unrestricted [1] materials. (TR. 661.)

34. DCAA and the Navy contended that a factor for scrap, raw or unrestricted material should not be applied to kits that did not require any Sikorsky labor. (TR. 670, 1656–58, 1661, 1674.)

35. By letter dated June 5, 1985, the Navy asked Sikorsky to discretely price unrestricted parts for "subkits upon which Sikorsky does not incur manufacturing labor costs." The letter also requested that Sikorsky submit a proposal for 1985 and 1986 bevel gears. (EX. 79.)

36. In response to the Navy's June 5, 1985 request, on or about June 26, 1985, Sikorsky submitted to the Navy a collection of "Shop Fabricated Spares Cost Worksheets," each of which was dated June 19, 1985. Consistent with the Navy's request, the June 19, 1985 worksheets reflected the discrete pricing of the unrestricted materials which went into the non-labor bearing kits the Navy was purchasing. Sikorsky also submitted a proposal for bevel gears. (EX. 549.)

37. The parties' final face-to-face negotiations occurred on June 26–28, 1985. During these negotiations, Sikorsky delivered to the Navy a Commitment Report for special project codes 3F and DG dated June 19, 1985 (EXs.110, 540), and a Purchasing Update dated June 27, 1985. (EXs.111, 532.)

38. On Tuesday, July 2, 1985, Yates and Madden negotiated by telephone. Sikorsky made an offer of $44,000,000 for the MGBIP exclusive of warranty. The price included over $2,000,000 for bevel gears. (EX. 118A.)

39. On the morning of Tuesday, July 9, 1985, Yates and Madden conversed again by telephone. In this conversation, Yates advised Madden that the Navy did not

1. The term "unrestricted" is used to describe low dollar value material such as nuts and bolts that are purchased in large quantities for use on many contracts, rather than acquired for a particular contract. (TR. 671–72.)

intend to purchase bevel gears from Sikorsky and offered a bottom-line price of $40,-400,000 for the MGBIP exclusive of warranty. Yates stated that when the price was definitized, the FY 1986 effort, then under option, would be a firm order. (EX. 118A.)

40. At approximately 3:37 p.m. on the afternoon of Tuesday, July 9, 1985, Yates and Madden spoke again by telephone. After Yates told Madden that a specific part, a Crown Coupling, was not included in the earlier bottom-line offer, Madden accepted the offer. (EX. 118A; TR. 1477–78.) The parties reached a price agreement of $40,400,000 on the MGBIP exclusive of warranty late in the afternoon of July 9, 1985.

41. During the negotiations, the parties were unable to agree on any major cost elements, including the cost element of material. (TR.1992–94, 1979–82, 2025–26, 2612–13; EX. 105 at 8.) The parties resolved this difficulty by resorting, at Yates' suggestion, to a "bottom-line" negotiation on the overall cost of the MGBIP exclusive of warranty. (TR. 781–82, 1974–75.)

42. Madden and Yates used different techniques in making their separate estimates of material cost. (TR. 742, 1964–65.)

43. Yates understood all of the data provided to him by Sikorsky, occasionally after asking Sikorsky for clarifications. (TR.2080–81.)

44. Yates testified that he "relied" on all of the information provided to him by Sikorsky. However, for his analysis he chose to use certain data and to discard other data. (TR.1955–60.)

D. *Certification and events following the July 9, 1985 agreement on price*

45. By letter dated July 25, 1985, Madden transmitted to the Navy a Certificate of Current Cost or Pricing Data ("Certificate"). The Certificate stated in pertinent part:

[T]o the best of my knowledge and belief, cost or pricing data as defined in FAR 15.801, submitted, either actually or by specific identification in writing (see FAR 15.804–2), to the Contracting Officer or his representative in support of Sikorsky Letters SPB 84–N3247 dated 14 May 1984 and SPB 84–N3248 dated 17 May 1984 are accurate, complete, and current as of 9th July, 1985.

The Certificate bore Sikorsky's name and Madden's signature and title. (EX. 121C.)

46. Together with the Certificate, Madden transmitted to the Navy a document entitled "Negotiated Price Schedule" and some recorded cost data. The recorded cost data included information on labor costs and material costs. The material cost information was supplied in the form of a Commitment Report dated July 10, 1985. This report contained information about purchase orders placed for the MGBIP as of July 9, 1985. (EX. 120.)

47. Sikorsky and the Navy later reached a $2,000,000 bottom-line agreement on the warranty portion of the procurement. (EX. 105 at 10.) The parties had continued to negotiate on the warranty following the July 9, 1985 agreement on the main gear box improvement kits and interim spares. (TR. 852.)

48. Yates prepared a post-negotiation BCM which he dated September 17, 1985. (TR.1991–92; EX. 105.) That BCM requested authorization to definitize Modifications P00001, P00004, and P00008 to contract N00019–83–C–0364 at a firm fixed price of $42,400,000, including warranty. (EX. 105.)

49. This post-negotiation BCM states that "the NAVAIR negotiator reached a final settlement on a bottom-line basis rather than attempting to reconcile differences on an element-by-element basis." There was no negotiated price for the material element. (EX. 105 at 8; TR.1992–93.)

50. As a result of the bottom-line settlement, Yates had wide latitude to assign an

amount for the material and other cost elements in his post-negotiation BCM. For example, in order to come to the $40,400,-000 base program (exclusive of warranty) price, Yates arbitrarily made a downward adjustment of the amount he had originally calculated as Sikorsky's estimated profit. (TR.1995–2000; *see* EX. 105.)

51. The amount Yates included in the post-negotiation BCM for the material cost element was $27,024,154. This amount was not negotiated between the parties. (*See, e.g.,* TR.1992–93, 2612–13; EX. 105 at 8.)

52. The post-negotiation BCM written by Yates contains numerous adjustments made by Yates to make the document support the bottom-line agreement of $40,-400,000. (TR.1991–2034; EX. 105.) Many of these adjustments were judgments made by Yates in the process of manipulating the numbers to support the bottom line price agreement.

53. Madden prepared documents, Negotiated Price Schedules, sometime after the agreement on price on July 9, 1985. (EXs. 551, 553, 555, 120 p. 266–280.) The purpose of these documents was to come up with unit prices for the contract line items and exhibit line items in the statement of work. (TR. 4080.) Madden created more than one document because it took more than one attempt to get the numbers close to the $40,400,000 agreed-upon figure for price. (TR. 4081.) Yates responded to the Negotiated Price Schedule accompanying the Certificate of Current Cost or Pricing Data sent to the Navy on July 25, 1985 (EX. 120 p. 266–280), that it was an unacceptable method for calculation of unit prices and asked that Sikorsky make some adjustments. (TR. 4088.) Madden made the adjustments and sent the revised document to Yates. (TR. 4088–89; EX. 553.)

54. In advance of final approval to enter into the Contract definitization modification, the Navy forwarded to Sikorsky for execution Modification P00013. (EX. 26.) Sikorsky signed the modification on October 9, 1985, and, by letter dated October 17, 1985, returned the executed document to the Navy. (EX. 26.1.)

55. On December 20, 1985, the post-negotiation BCM was given final approval by the Navy thereby authorizing it to award the modification. (EX. 105 at 30.)

56. On or about January 17, 1986, Daniel Nielsen, a Navy contracting officer responsible for the Contract at the time, entered into Contract Modification P00013 by executing it, and thereby formally awarded this modification to Sikorsky. (EX. 26.)

57. Soon after the award, Sikorsky began submitting invoices for subkits and interim spares that it delivered to the Navy in connection with Contract Modifications P00001, P00004, P00008 and P00013. (TR. 2811–15.)

E. *The DCAA's Defective Pricing Audit*

58. By an Avoid Verbal Orders ("AVO") form dated October 22, 1985, the DCAA advised Sikorsky that it was "commencing a post award review of contract number N00019–83–C–0364 mod P00001, ECP 5923 R1 H3 Main Gear Box Improvement Kits." (EX. 121B.) The AVO further advised that the initial information required to begin this review was (1) A Certified Bill-of-Materials; (2) a Commitment Run for Parts; and (3) Year To Date Incurred Cost Data. (EX. 121B.)

59. The DCAA request for a certified bill of materials was forwarded to Madden and Kiesel. Because no certified bill of materials existed, Madden and Kiesel collected alternative information to satisfy the DCAA request. (TR. 1496, 1498–99.) This collection of documents became known as the "so-called July 9, 1985 BOM."

60. The so-called July 9, 1985 BOM is essentially a forty-four-page compilation of subkit bills of materials and yearly material cost summaries. It includes pages of Shop Fabricated Spares Cost Worksheets, personal computer listings of parts for certain subkits and interim spares, and other

listings of support, tooling and test equipment. Some of the pages contain handwritten additions and corrections. It includes three material cost summary pages, dated 07/09/85, reflecting the date of agreement on price. (TR. 1443.) Also included is a one-page, undated, handwritten cover sheet prepared by Madden and Kiesel. The cover sheet was created after July 9, 1985, and lists amounts for the various categories of material the Navy was purchasing by fiscal year. Kiesel incorrectly totaled the amount he and Madden had listed on this page. (TR. 1484–85, 4052–53; EX. 15.5.)

61. Sometime on or before November 15, 1985, Kiesel gave Albert Gaulzetti the forty-four-page compilation (the so-called July 9, 1985 BOM) prepared in response to DCAA's request for a certified bill of materials. (TR. 2862–63.) Gaulzetti worked in Sikorsky's Pricing Compliance Department and acted as a liaison between Sikorsky and DCAA. (TR. 2173.)

62. On or about November 15, 1985, Gaulzetti forwarded the compilation to DCAA auditor Daniel Sparano. (TR. 2868.)

63. During the DCAA post-award audit, sometime in 1986, Sparano saw the May 30, 1985 New York Air Brake Company price quotations and Sikorsky's Cost Price Analysis Report No. 4446. (TR. 2197–2201; EX. 35, 36.) Both items were in the Sikorsky "Buyer's File" for purchase order 117203. (EX. 29.)

64. On July 23, 1986, as part of the DCAA audit, Sparano met with Madden, Kiesel and Gaulzetti. (TR. 2511.) Shortly after the meeting, Sparano made handwritten notes of what he believed had occurred. (TR. 2512–13; EX. 121.)

65. The notes incorrectly attribute to Madden statements to the effect that by July 9, 1985, he had developed "a new position for material" to be negotiated "of $24,965,099," and that on that same date Yates called Madden and advised that he, Yates, had done an analysis and arrived at $27,000,000 as the amount for material. (EX. 121.)

66. Following the July 23, 1986 meeting, Sparano set forth in other handwritten notes dated that same day "some observations." These included Sparano's observation that the NAVAIR post-negotiation BCM amount "is not valid," due to the use of inconsistent unit prices and incorrect quantities. (EX. 121.) These "observations" contain mistakes, unsupported inferences and opinions. (TR. 2343–51.) Viewed as a whole, Sparano's notes are not credible. Among other things, he referred to outside sources when making his handwritten notes of various conversations, but makes no mention of having done so. (TR. 2514–19.) Specifically, he attributed certain numbers to individuals which actually came from other sources. Further, several years later, when creating a typewritten version of the handwritten notes, he made numerous changes and omissions. (TR. 2540–41, 2542–44, 2591–93.)

67. On August 27, 1986, Sparano met with Bordone, a Navy employee who assisted Yates in the negotiations leading to modification P00013. A typewritten version prepared in October or November, 1989, of the notes Sparano made shortly after the 1986 meeting states:

> The remainder of the meeting and conversation revolved around the issue of the difference between the BOM's [the amount in the post-negotiation BCM and the 44-page compilation given to DCAA in November, 1985]. Bordone was of the opinion that this issue was not a valid adjustment. The Auditor countered with a published ASBCA case which found that this type of issue was found to be a valid defective pricing issue.

(EX. 569.)

68. On September 12, 1986, Sparano conducted an exit conference with Gaulzetti. In the conference, Sparano presented his audit findings. Sparano alleged that Sikorsky had failed to disclose various cost

or pricing data, including the New York Air Brake quotations of May 30, 1985, and the compilation of documents Gaulzetti had provided to him in November, 1985. (TR. 2220–22; EX. 15.5.) Sparano erroneously concluded that the latter was a consolidated bill of materials and that the compilation existed as of July 9, 1985. (TR. 2520–22.)

69. Contractors are typically given 30 days to respond to allegations of defective pricing brought to their attention during an exit conference. Sikorsky was given six days, until September 18, 1986. (TR. 2573–74, 2578.)

70. On September 18, 1986, Sparano met again with Gaulzetti. Gaulzetti acknowledged that the forty-four-page compilation of documents Sikorsky had given DCAA in November, 1985, was never given to the Navy. However, he told Sparano that, through other documents, namely through computer printouts, worksheets, and floppy disks formatted for the Navy's computer, Sikorsky had given the Navy updated information. Gaulzetti disagreed with some of Sparano's additional findings of defective pricing unrelated to the so-called July 9, 1985 BOM and provided to Sparano documents in support of Sikorsky's position. (TR. 2584–88.)

71. Gaulzetti asked Sparano to compare this information which Sikorsky had submitted to the Navy with that which Sparano believed was not disclosed. Sparano's handwritten notes state that "[w]hen review this info: [sic] and comparing to 7/9/85 updated BOM, the auditor found that they did reconcile." (EX. 121 at A–14a–2.) Over three years later, while assisting the Naval Investigative Service agents in their investigation of this matter, Sparano transcribed these handwritten notes but amended them to read "[t]he auditor review these printout [sic] he found in some cases that the material parts did include updated unit cost which reconcile with the updated BOM and in other cases they did not." (EX. 569.) Thus, while it remains unclear when the government first discovered that some of the unit prices Sikorsky disclosed during the negotiations did not reconcile to those in the so-called July 9, 1985 BOM, the inconsistent versions of these notes cast doubt on the veracity of Sparano's recorded recollection of what occurred in his July 23, 1986 meeting with Madden, Kiesel, and Gaulzetti. (*See* Findings 64–65.)

72. On September 19, 1986, after having reviewed the information which Sikorsky had provided, Sparano reviewed other information in Sikorsky's files and told Gaulzetti, during that review, that nothing he had seen had caused him to change his mind. (TR. 2596–97.)

73. On September 19, 1986, Sparano called the Navy's negotiator, Yates. Yates advised Sparano that Sikorsky had never submitted a consolidated bill of materials for the program, but that he had received from Sikorsky during the negotiations updated information on computer printouts and on floppy disks. Yates further advised Sparano that during the negotiations he had never made an offer of $27,000,000 for material to Sikorsky. (TR.2065, 2609–13.) During this conversation, Sparano incorrectly informed Yates that he had received a consolidated bill of materials (BOM) from Sikorsky. (TR. 2609–10.) Yates was surprised to learn of this and responded that he had asked for one during the negotiations, but never received it. (TR.2061.)

74. Although Sparano believed that the forty-four-page compilation DCAA received in November, 1985, was a consolidated bill of materials, he did not show it to Yates, if at all, until after DCAA issued the audit report on October 2, 1986. If Sparano had done so, Yates would have disagreed with Sparano's conclusion that the compilation was a consolidated bill of materials. (TR. 2610–11, 2613–14, 2060–64.)

75. In DCAA's October 2, 1986 audit report, Sparano still referred to a negotiated figure of $27,000,000 for material, (TR.

2613; EX. 570), despite what he learned from Yates and despite the fact that Yates' post-negotiation BCM explicitly stated that the negotiation was settled on a bottom-line basis and that there was no negotiated amount for any cost element. (EX. 105.)

76. Sparano concluded that Yates did not realize the impact of the updated information provided by Sikorsky. (TR. 2600–01; EX. 121.) He reached this conclusion without discussing it with Yates. (TR. 2600.) Had he done so, he would have learned that Yates understood all of the data provided to him by Sikorsky. (*See* Finding 43.) Sparano also could have examined Yates' post-negotiation BCM to see if Yates used the data that Sparano believed he did not understand, but he did not do so. (TR. 2605.)

77. Typically, when determining if there was defective pricing, Sparano would want to find out from the government negotiator whether he or she relied on the data alleged to be defective. (TR. 2469.) Sparano did not inquire of Yates or Bordone as to whether the defective data regarding the New York Air Brake modification kits were relied upon. (TR. 2469.)

78. Sparano indicated on a DCAA checklist that he followed DCAA's standard defective pricing audit program. (EX. 567.) However, Sparano computed a recommended price adjustment, but failed to compare the proposal as updated by Sikorsky's submissions of cost or pricing data to the undisclosed cost or pricing data available to Sikorsky as of the date of price agreement. Sparano computed a recommended price adjustment on a different basis. (TR. 2469–72, 2532–34.)

79. On October 2, 1986, DCAA issued audit report number 2661–6B420008, which was transmitted to the Navy. (EX. 570.) That report set forth recommended adjustments to the price of Modification P00013. These adjustments were in part based on the difference between what DCAA incorrectly believed was the "material amount negotiated for kits and spares of $27,024,-154 and the amount reflected on the bill of material dated 9 July, 1985." (EX. 570 at 7; TR. 2689.) This was the only time that Sparano ever made a recommendation for a price adjustment for defective pricing without consideration of the data a contractor had disclosed. (TR. 2533–34.) The audit report recommended a cost adjustment of $2,176,112 for the kits and spares. (EX. 570.)

80. DCAA could not determine what the parts were that made up Yates' $27,024,-154 amount stated in his post-negotiation BCM. (TR. 2689; EX. 105.) Yates acknowledged that the $27,024,154 amount was not negotiated between the parties, but rather was justification of his recommendation on the price agreement in the post-negotiation BOM. (TR.1999–2001, 2025–26.)

81. DCAA's audit report cited Sikorsky for defective pricing for five parts that it claimed were not updated even in the claimed July 9, 1985 BOM. At trial Sparano admitted that DCAA was wrong as to these parts. (TR. 2682–83.)

82. DCAA also cited Sikorsky for defective pricing regarding an interim spare. (TR. 2685–86.) However, Yates used the correct pricing in his post-negotiation BCM. (TR. 2704–07.) At trial, Sparano conceded that, had he looked at the post-negotiation BCM regarding this part, he would have found the allegedly undisclosed prices. (TR. 2707.)

83. DCAA's formulation of the recommended price adjustment was incorrect in that, contrary to DCAA's belief, the parties did not negotiate an amount for kits and interim spares. (TR. 2612–13.) The $27,024,154 figure DCAA used was instead the amount Yates calculated for inclusion in his post-negotiation BCM after the bottom-line price agreement. (TR.1992–94.) Additionally, the Court finds that the forty-four-page compilation of documents DCAA received in November, 1985, did not exist on July 9, 1985. Thirteen of these pages were given to the Navy as part of the April 20 Program Update.

(*Compare* EX. 6 *with* EX. 15.5.) The remaining pages included adjustments of both facts and judgments, some made by Sikorsky after July 9, 1985, using information available and disclosed as of that date. For example, the denomination of a part called a "crown coupling" as government furnished equipment ("GFE"), was information that Madden did not learn until the 3:37 p.m. call on July 9, 1985, which resulted in the agreement on price. (TR. 1442, 4063–64, 4071.)

84. Around the time DCAA transmitted the audit report dated October 2, 1986, to the Navy, DCAA also advised Department of Defense criminal investigators of Sikorsky's "suspected irregular conduct." (EX. 125.) In this fraud referral, dated October 28, 1986, DCAA raised questions about Sikorsky's failure to disclose the forty-four-page compilation. The referral also alleged fraud in connection with Sikorsky's Cost Price Analysis Report No. 4446 ("CPA Report No. 4446"), which discussed the prices proposed by New York Air Brake for the modification kits. DCAA suspected irregular conduct because the typewritten date, "6/24/85," on the report was written over in pen to read "7/14/85." (EX. 125.)

85. The government conducted a criminal investigation into the allegations made in the October 28, 1986 DCAA Suspected Irregular Conduct referral form. In February, 1988, Sikorsky was served with an Inspector General subpoena for documents. (EX. 581.)

F. *Navy–Sikorsky interaction during the fraud investigation*

86. On October 29, 1986, the Navy forwarded to Sikorsky for review and comment a copy of DCAA's October 2, 1986 audit report. (EX. 570.)

87. By letter dated December 5, 1986, Sikorsky offered a partial response to DCAA's October 2, 1986 audit report, (EX. 572), indicating that information concerning several of DCAA's allegations regarding undisclosed purchase orders had been disclosed in Commitment Reports and Purchasing Updates given to the Navy before the price agreement. Sikorsky also sought discrete information about which of the parts in the forty-four-page compilation given to DCAA in November, 1985, were defectively priced, and about the evidence proving that defective pricing. (EX. 572.)

88. Concerning the New York Air Brake parts, the December 5, 1986 letter stated that Sikorsky "agree[d] that there were lower cost or pricing data available, ... [but] disagree[d] with the disclosed costs used by DCAA in its calculations of alleged defectiveness. The use of the incorrect amount disclosed overstates the claim of defectiveness." (EX. 572.)

89. On January 6, 1987, Dana Smith, a lawyer for the Navy, wrote a memorandum to Yates attaching a notice of the DCAA's October, 1986 fraud referral. The memorandum advised Yates to forward the information to the person responsible for the Contract, if he was no longer that person. Also, the memorandum instructed that:

No defective pricing or other issues related to the facts described in the report should be resolved, settled, etc. without first checking with the Defense Procurement Fraud Unit to ensure no Government interests would be compromised thereby.

(Court's Exhibit 1.)

90. Paul Saunders, the contracting officer then responsible for the Contract, received Smith's memorandum from Yates. (TR. 2937.)

91. On January 7, 1987, Saunders wrote to Sikorsky, advising it that:

1. We are forwarding your [December 5, 1986] rebuttal to the Resident Auditor, DCAA for his comments, which we are going to review before contacting you again.

2. At this time, we are holding your request for certain documentation in

abeyance, pending receipt of the Resident Auditor's comments, which we wish to review before further proceeding in this matter. (EX. 727.)

92. By letter dated February 2, 1987, Sikorsky provided additional rebuttals to DCAA's October 2, 1986 audit report and submitted offsets to its admitted defective pricing on the New York Air Brake parts. It renewed its request for information about the bills of materials allegation. (EX. 573.)

93. In a letter dated March 24, 1987, Sikorsky renewed its request for information about the bills of materials allegation. (EX. 575.)

94. On August 14, 1987, Sikorsky again wrote to the Navy requesting information about the bills of materials allegation in the October 2, 1986 audit report. (EX. 577.)

95. On September 30, 1987, the Navy forwarded to Sikorsky DCAA's first supplement to its October 2, 1986 report. That supplement was dated April 6, 1987, and contained a DCAA memorandum dated February 15, 1987. It pronounced Sikorsky's proposed offsets "highly questionable." DCAA increased the amount of its previously recommended price adjustment. (EX. 578.)

96. Also in the September 30, 1987 letter, the Navy replied to Sikorsky's request for information about the bills of materials allegation by telling Sikorsky to seek relief under the Freedom of Information Act ("FOIA"). (EX. 578.)

97. By letter dated October 30, 1987, Sikorsky replied to the Navy's September 30, 1987 letter. Sikorsky offered rebuttals to allegations DCAA made in its April 6, 1987 supplemental audit report. In response to the Navy's September 30, 1987 suggestion, Sikorsky asked that its letter be treated as an FOIA request for information about the bills of materials allegation. (EX. 579.)

98. On January 14, 1988, the Navy responded to Sikorsky's October 30, 1987 FOIA request by providing Sikorsky with the post-negotiation BCM. (EX. 580.)

99. By letter dated February 3, 1988, DCAA responded to Sikorsky's October 30, 1987 FOIA request. DCAA advised that the documents regarding the bills of materials allegation that Sikorsky was seeking "do not exist in this form." DCAA said that the "recommended price adjustment represents the difference between the negotiated material cost for kits and spares as detailed in the NAVAIR Post Negotiation Memorandum of $27,024,154 and material costs for kits and spares of $24,848,042 as detailed in the contractor's 9 July 1985 Bill of Material." (EX. 581.)

100. As early as December, 1986, DCAA, and specifically Sparano, knew that the information Sikorsky was seeking did not exist. DCAA did not inform Saunders or Sikorsky of this for more than 14 months, after a Department of Defense Inspector General subpoena was issued and after Sikorsky's FOIA request. (TR. 2698–99, 2711–13.)

101. On or about February 29, 1988, DCAA issued a second supplement to its October 2, 1986 audit report. (EX. 583.) Although generally such audit reports are sent by the contracting officer to the contractor for review and comment, this one was not. (TR. 2941, 2971–72.) In this February 29, 1988 supplement, DCAA, having reviewed Sikorsky's August 14, 1987 and October 30, 1987 rebuttals, acknowledged that many of its findings occasioned by Sikorsky's offset claim, were "erroneous." However, as to practically all of its October 2, 1986 recommendations, DCAA's recommended adjustment remained the same. The February 29, 1988 second supplemental audit report recommended a price adjustment of $3,999,203. (EX. 583.)

102. On March 16, 1988, Contracting Officer Saunders wrote to the Naval Investigative Service concerning the alleged de-

fective pricing on Modification P00013. Saunders wrote:

This is to confirm your . . . request to us not to continue with the subject defective pricing until your investigation, which is currently in progress, has been completed. . . .

We have been asked by [Sikorsky] to expedite our defective pricing action but have in the past avoided any reference to your investigation. We understand that we can now disclose to Sikorsky that we are on hold, pending the completion of your investigation, since [Sikorsky] has been made aware of your investigation.

(EX. 734.)

103. Despite his knowledge of the investigation and his belief that he was precluded from settling the defective pricing allegations with Sikorsky, Saunders acted toward Sikorsky in a manner consistent with the steps he ordinarily took to settle routine defective pricing. (TR. 2941–44, 2957–58, 2966–67.)

104. By letter dated April 15, 1988, Sikorsky sent a check for $436,324 to the Navy. The amount represented what Sikorsky then believed was its defective pricing liability less valid offsets. The letter stated that Sikorsky believed that "with this payment, . . . [its] obligations regarding defective pricing have been satisfied." (EX. 584.)

105. By letter dated April 28, 1988, the Navy returned the check. In this letter, the Navy said that it was still evaluating DCAA's findings. The letter also referenced the government's investigation, noting that it was not yet complete. The Navy said: "Since we have no firm position as yet, we cannot consider your [April 15] letter as a starting point for negotiations, nor can we take any other steps." (EX. 585.)

106. By letter dated May 26, 1988, Sikorsky once again sent a $436,324 check to the Navy. Sikorsky's letter stated that its "check was intended only to represent the

amount we agreed was due and owing," and added that "the check was not intended to prejudice any rights or positions of either party with respect to any other issues . . . ." This check was also designed to prevent further interest from accruing on the money that Sikorsky believed it owed the government. (TR. 2645–46; EX. 586.)

107. In a letter dated August 15, 1989, the Navy once again returned Sikorsky's $436,324 check. The Navy had held the check on advice of counsel. (TR. 2984.) The Navy stated that it was returning the check due to the fact that the government's investigation of the matter was not yet concluded. (EX. 587.)

## G. The government's allegations

108. In its amended complaint, the government alleged that Sikorsky had in its possession on or before July 9, 1985, a bill of materials dated July 9, 1985. (The so-called July 9, 1985 BOM.) In addition, the complaint alleges, without identifying, the existence of earlier versions. (First Amended Complaint ¶ 12.) At trial, it became apparent that the "earlier version" the government referenced in its complaint was a document created by Madden and called the Norden Update. (EX. 19.1.)

### (1) The so-called July 9, 1985 BOM

109. The Court finds that the forty-four-page collection of documents making up the so-called July 9, 1985 BOM was created by Madden subsequent to the July 9, 1985 price agreement in response to DCAA's October, 1985 request for a certified bill of material. (EX. 121B.)

110. The Court finds that, on a date after the July 9, 1985 price agreement, Madden began to prepare a price schedule for the subkits and interim spares. That schedule was ultimately forwarded to the Navy on July 25, 1985. (See Finding 46; TR. 2868, 4079–80.)

111. Madden made several attempts to fit the material cost estimate to the negotiat-

ed price of $40,400,000. (TR. 4079–81.) This process required Madden to make adjustments to some of the unit prices in the lists of parts that he maintained, using both factual information from the data that Sikorsky had previously submitted to the Navy and his judgment. (*See* Finding 53.) Some of the adjustments that Madden made in his effort to create a price schedule are reflected in the pages of the so-called July 9, 1985 BOM.

### (2) *The Norden Update*

112. Sometime between June 28, 1985, and July 5, 1985, Madden completed an analysis of the cost of the parts included in a particular subkit which were not listed on the Purchasing Updates.[2] (TR. 1247–48; EX. 19.1.) Because the analysis was done in the offices of Norden Systems, Inc., a United Technologies Corporation subsidiary, this analysis was called the Norden Update.

113. To create the Norden Update, Madden and Kiesel compared the previously disclosed prices of parts with those found in the then-current June 19, 1985 Commitment Report. (TR. 1252–53, 1273.) This Commitment Report was provided to the Navy on June 26, 1985. (*See* Finding 23.)

114. In addition to the factual information taken from the Commitment Report, the Norden Update contained numerous judgments on the part of Madden. (TR. 1272–73.) All of the factual data in the Norden Update was provided to the Navy. (*See* Finding 113.)

115. The Court finds that Sikorsky had no obligation to provide the Norden Update to the Navy. There is no dispute that Sikorsky disclosed the Commitment Report from which the Norden Update was created. (TR. 1248–49, 1252–53, 1274, 1951–53, 1973; EX. 110.) Yates could have performed the same mathematical exercise and was not significantly disadvantaged by the fact that Sikorsky did not

provide him with its analysis of previously disclosed data. The government has failed to show that cost or pricing data contained within the Norden Update was not disclosed to Yates.

### (3) *New York Air Brake Parts*

116. On August 22, 1984, Sikorsky issued NTE Purchase Order No. 117203 to the New York Air Brake Company (N.Y.AB) for two modification kits, part numbers 937522 and 937513. Purchase Order No. 117203 specified a price of $860 per unit for each of the two kits, subject to downward negotiation. (EX. 33B.)

117. On April 25, 1985, Sikorsky buyer Robert Goldstein spoke with a representative of New York Air Brake and informed him that Sikorsky would be purchasing an increased quantity of each of the modification kits. New York Air Brake agreed to review its $860 NTE price based on the increased quantities, but did not tell Goldstein that its prices would be going down. New York Air Brake did not inform Goldstein that it had solicited lower quotations from its own suppliers. (TR. 288–90, 316.)

118. On April 26, 1985, Sikorsky issued Supplement 1 to Purchase Order 117203. By this supplement, Sikorsky ordered additional quantities of each of the New York Air Brake modification kits at the previously set $860 per unit NTE price. (EX. 33.)

119. By letter dated May 30, 1985, New York Air Brake Company forwarded to Sikorsky quotations for each of the two modification kits. In place of the $860 NTE price, New York Air Brake Company's May 30, 1985 letter included SF 1411s listing prices of $226.59 for one part, and $213.60 for the other. (EX. 35.) The New York Air Brake cover letter was addressed to John Piatak, a Sikorsky buyer. (EX. 35; TR. 227, 317–18.)

120. On June 20, 1985, a Sikorsky cost price analyst, Frank Spitz, visited New

---

**2.** Although the government argues that the Norden Update was created no later than June 28, 1985, it has failed to sustain its burden of proof on this claim.

York Air Brake to conduct a "fact-find" on the May 30, 1985 quotations. (TR. 335, 346; EX. 36.)

121. Spitz prepared Cost Price Analysis Report # 4446 (CPA Report # 4446) to report on his June 20, 1985 fact-find. (EX. 29 at 4217) The date of the report is typed "6/24/85." This date was altered by hand to read "7/14/85." (EXs. 29 at 4217, 36.) No evidence was produced that allows this court to make a determination as to who changed this date. By the time of trial, Spitz had died.

122. The report recommended that Sikorsky seek prices that were lower than the May 30, 1985 quotations for the parts. (EX. 36.)

123. John Giamarino, Spitz's supervisor, signed and approved the report on July 16, 1985. The report was not released to the buyer or his supervisor until after Giamarino's approval and signature. (TR. 348, 353–55; EX. 36.)

124. With regard to the New York Air Brake Company parts, Buccilli sought information for the Purchasing Update from Buying Group 4. (TR. 593–94.)

125. In or about mid-June, 1985, Sikorsky shifted responsibility for buying the two New York Air Brake parts from Buying Group 4 to Buying Group 7. (*Compare* EX. 110 & EX. 111 (June 19, 1985 Commitment Report and June 27, 1985 Purchasing Update respectively, showing parts as being purchased by Buying Group 4) *with* EX. 112F (June 27, 1985 Commitment Report showing parts as being purchased by Buying Group 7).)

126. Sikorsky's system for updating pricing information was designed to inform Buccilli when responsibility for a particular part changed buying groups. He was routinely informed when this happened. (TR. 525–26.) However, Buccilli did not learn about the switch from Buying Group 4 to Buying Group 7 and continued to request information on the New York Air Brake parts from Buying Group 4. (TR. 594–95.)

127. Because of this error, Buccilli did not receive information about the lower cost quotations forwarded by New York Air Brake when he was preparing the June 27, 1985 Purchasing Update and, as a consequence, information about the May 30, 1985 quotations was not included in the June 27, 1985 Purchasing Update. (TR. 591–92; EX. 111.) The information was not forwarded to Madden and Madden did not forward the information to the Navy.

128. The failure to provide Madden and the Navy with the lower New York Air Brake quotations was the result of a failure in Sikorsky's in-house transmission of information rather than a deliberate misrepresentation. Buccilli did not intentionally avoid learning of the lower quotations or act with reckless indifference to the true state of the New York Air Brake prices. (TR. 533–35, 554, 557, 586, 591–92.)

129. Sikorsky did not adopt the target prices recommended in CPA Report # 4446 until November 18, 1985. (TR. 360; EX. 563, 564.)

130. On March 15, 1986, Sikorsky issued Supplement 7 to Purchase Order No. 117203, setting the prices of the New York Air Brake parts at $166 and $155 per unit, the higher of the target prices listed in the report. (EX. 29 at 4181–83.)

131. The Court finds that Sikorsky had cost or pricing data relating to the NYAB parts that it did not disclose to the Navy prior to the July 9, 1985 price agreement. The Court does not find that Sikorsky's failure to disclose this information was intentional or reckless.

(4) *The government's specific part allegations*

132. With respect to unit prices, in paragraph 14 of the amended complaint, the government alleged that Yates relied on the June 27, 1985 Purchasing Update for the actuator, part number 61350–24802–101, for both FY 1984 and FY 1985. (First Am. Compl. ¶ 14; EX. 150 at 21

(part # 4).) The government claimed that the unit price listed for that part in the June 27, 1985 Purchasing Update was $64.00 higher for FY 1984 and $134.60 higher for FY 1985 than the amounts found in the undisclosed, so-called July 9, 1985 BOM.

133. Sparano testified that the so-called July 9, 1985 BOM unit price for the FY 1984 actuator was not current or accurate. (TR. 2366.) He acknowledged that the price failed to take into account a higher unit cost which Sikorsky paid for some of the pieces needed to fill the 1984 requirement. (TR. 2368.)

134. Sparano also testified (TR. 2365–66), that the weighted average cost calculation in the June 27, 1985 Purchasing Update, which was disclosed to the Navy during negotiations, did take into account the higher unit cost which Sikorsky paid for some of the required actuators. (TR. 2365–67; EX. 111.) Thus, the information in the June 27, 1985 Purchasing Update was in this regard current, accurate and complete.

135. Rounding to the nearest dollar, the June 27, 1985 Purchasing Update unit cost for the FY 1984 actuator was the same as the unit cost information which Yates used in his post-negotiation BCM. (TR. 2365; EX. 105.) The Court finds that Sikorsky provided current, accurate, and complete cost or pricing data regarding the FY 1984 cost for the actuator; and, at least in the preparation of the post-negotiation BCM, Yates used that same cost or pricing data.

136. The government alleged in paragraph 14 of the amended complaint that the June 27, 1985 Purchasing Update contained a false unit price for the actuator which was $134.60 higher than the unit price found in the so-called July 9, 1985 BOM.

137. Sparano testified, however, that the June 27, 1985 Purchasing Update FY 1985 actuator unit cost amount of $3,673 was the same as that found for this part in the June 19, 1985 Commitment Report's listing of purchase order information. (TR. 2367; EX. 110.)

138. There was no specific unit cost information for the FY 1985 actuator in the so-called July 9, 1985 BOM. Sparano testified that he was "at a loss" to explain how he derived the number he represented in Plaintiff's Exhibit 150 as the cost for the part taken from the so-called July 9, 1985 BOM. (TR. 2397; EX. 150 at 21.) Sparano could not replicate the amount. (See TR. 2398, 2401–03.) Nonetheless, he admitted that the number he used for the so-called July 9, 1985 BOM for this part involved the use of some escalation. (TR. 2403.)

139. Sparano admitted that what escalation a contractor or, for that matter, the government would choose to use in estimating prices was not a verifiable fact. (TR. 2368–69.) The Court finds that a number which is the product of such judgment would be outside the definition of cost or pricing data and nondisclosure of such a number cannot provide a basis on which to claim defective pricing. The government has failed to meet its burden of proving that Sikorsky failed to disclose current, accurate or complete cost or pricing data for the actuator unit.

140. The government alleged that there was a unit price decrease of $1.36 for the FY 1984 housing, part number 61350–24060–103, between the June 27, 1985 Purchasing Update and the so-called July 9, 1985 BOM. (First Am. Compl. ¶ 14; EX. 150 at 24 (part # 36).)

141. In Plaintiff's Exhibit 150 at 24, the difference between what is listed for the part in Yates' post-negotiation BCM and the June 27, 1985 Purchasing Update on the one hand, $440, and in the so-called July 9, 1985 BOM on the other, $439, was ascribed by Sparano to "rounding." (TR. 2325–26.) "Rounding" is not cost or pricing data. Additionally, even if the difference in amounts were not attributable to rounding, the $1.36 amount of the alleged defective pricing, First Amended Complaint ¶ 14, multiplied by the requisite

quantity of 108, amounts to $146.88. Even after burdens and profit are applied, the amount is trivial in comparison to the material amounts for kits and interim spares variously estimated to be in the tens of millions of dollars by the parties. The amount could not have had a significant impact on the negotiated price.

142. The government further alleged that there was a unit price decrease of $129.87 for the FY 1985 bearing, part number SB2106–103, between the June 27, 1985 Purchasing Update and the so-called July 9, 1985 BOM. (First Am. Compl. ¶ 14; EX. 150 at 24 (part # 34).)

143. Mr. Sparano testified that he found the unit cost information for FY 1985 for this bearing in the so-called July 9, 1985 BOM, (TR. 2414; EX. 15.5 at 32), and that the amount listed, $253.73, was stated to be a weighted average. (TR. 2414.) He did not verify the weighted average calculation. (TR. 2414.)

144. The weighted average shown in the so-called July 9, 1985 BOM was a calculation using the three purchase orders for that part listed in the June 19, 1985 Commitment Report. (TR. 2416–17; EX. 110.)[3] In the June 27, 1985 Commitment Report there were only two purchase orders for that part, (TR. 2418; EX. 541),[4] which were used to arrive at the amount listed as the weighted average for this part in the June 27, 1985 Purchasing Update. This amount is identical to the amount used by Yates in his post-negotiation BCM. (EXs. 105; 111.)

145. At trial, the government acknowledged it did not know which of the differing weighted averages in the so-called July 9, 1985 BOM (using three purchase orders)

and the June 27, 1985 Purchasing Update (using two purchase orders) was correct. (TR. 2419.) The government presented no further evidence on this point. There was, therefore, no evidence that established that the number found in the so-called July 9, 1985 BOM was accurate, and therefore cost or pricing data requiring disclosure.

146. Lastly, the government alleged that there was a unit price decrease of $2.00 for the FY 1986 forging, part number 61350–24051–001, between the June 27, 1985 Purchasing Update and the so-called July 9, 1985 BOM. (EX. 150 at 25 (part # 42).) That exhibit, however, showed the difference as $4, not $2 as alleged in the Amended Complaint.

147. Sparano verified that for this part for FY 1986, the $140 amount found in the post-negotiation BCM and the June 27, 1985 Purchasing Update were identical. He further confirmed that the Purchasing Update stated that the amount was based on a quotation that Sikorsky had received. (TR. 2381.) He testified that he would consider a quotation to be cost or pricing data. (TR. 2381–82.)

148. Sparano also testified that the so-called July 9, 1985 BOM did not specifically contain a unit cost for this part for FY 1986. (TR. 2386.) He acknowledged that there was no FY 1986 Commitment Report showing a purchase order amount for this part. (TR. 2382.) Sparano admitted that the FY 1986 number he used for this part in Plaintiff's Exhibit 150 was the unescalated amount of the FY 1985 purchase order. He used this number because Sikorsky applied a judgment not to use escalation in the so-called July 9, 1985 BOM for the subkit containing this part. (TR. 2389–90.) The government offered no ex-

---

3. In fact, the weighted average shown in the so-called July 9, 1985 BOM was itself the product of a slight miscalculation which resulted in the figure shown being incorrect by 0.14¢. Mr. Madden transposed the amounts for two of these purchase orders. (*Compare* EX. 19.1, the Norden Update, *with* EX. 110, the June 19, 1985 Commitment Report, at 1416.) Sparano made a similar error during trial when Sikorsky asked that he confirm the

amount shown in the July 9, 1985 BOM. (TR. 2415–17.)

4. In the June 27, 1985 Commitment Report, the third purchase order that was listed in the June 19, 1985 Commitment Report for this part was transferred to a different part. (TR. 2418–19.)

planation why the judgmentally arrived-at unit cost for FY 1986, as derived by Sparano from the so-called July 9, 1985 BOM, should take precedence over the quotation for this part for FY 1986 identified in the June 27, 1985 Purchasing Update. As noted above, Sparano conceded that the quotation was cost or pricing data. (TR. 2390.) The Court finds that Sikorsky disclosed cost or pricing data for this part for FY 1986, the quotation, but did not disclose cost information that was derived from a judgment. The Court cannot find defective pricing. The government has failed to show that Sikorsky did not disclose current, accurate and complete cost or pricing data for the FY 1986 unit cost of the forging.

149. Although not alleged in the Amended Complaint, at trial the government presented evidence of other instances where the unit costs for some parts found in the June 27, 1985 Purchasing Update were different than those found in the so-called July 9, 1985 BOM.

150. Among those parts used by Yates in the post-negotiation BCM was the FY 1986 actuator, part number 61350–24802–101. (EX. 150 at 21 (part # 4).) The FY 1986 unit cost set out in the June 27, 1985 Purchasing Update is lower than that which Sparano calculated for what he believed the so-called July 9, 1985 BOM would have shown had it displayed an amount for the part for FY 1986. (EX. 150.) Where the disclosed data is lower than the undisclosed data, as Sparano repeatedly testified, there would be no DCAA citation for defective pricing. (*See,* *e.g.,* TR. 2373–74; 2374–75.)

151. Another part used by Yates was a bearing, part number SB2106–103. At trial the government pointed out that the FY 1984 unit cost listed in the June 27, 1985 Purchasing Update differed from the FY 1984 unit cost for the part found in the so-called July 9, 1985 BOM. (EX. 150 at 21.) However, the amount in the Purchasing Update, which was used by Yates in his post-negotiation BCM, was lower than the amount in the BOM. Sparano testified that under such circumstances he would not cite Sikorsky for defective pricing. (TR. 2373–74.)

152. Sparano reiterated that testimony with regard to a forging, part number S6135–20134–005. (TR. 2374–75; EX. 150 at 22 (part # 17).) The unit cost shown for that part for FY 1984 in the June 27, 1985 Purchasing Update was lower than the unit cost found for that part for FY 1984 in the so-called July 9, 1985 BOM.

153. Sparano testified that there was no defective pricing regarding another bearing, part number SB1357–103. (TR 2375; EX. 150 at 23 (part # 21).) For FY 1984, the June 27, 1985 Purchasing Update amount, again identical to the amount used by Yates in his post-negotiation BCM, was lower than the amount found for the part for FY 1984 in the so-called July 9, 1985 BOM.

154. The Court notes that for this bearing, SB1357–103 for FY 1986, the June 27, 1985 Purchasing Update amount was higher than the amount Sparano determined was included for this part in the so-called July 9, 1985 BOM. However, Yates did not use the June 27, 1985 Purchasing Update unit cost amount but instead used the same amount that Sparano determined Sikorsky had included in the so-called July 9, 1985 BOM. (EX. 150 at 23.) Thus, the government has failed to show that Mr. Yates relied on the inaccurate unit cost data for this bearing.

155. The government also introduced evidence with respect to another bearing, part number SB3612–102. (EX. 150 at 24 (part # 35).) The unit price for FY 1986 in the June 27, 1985 Purchasing Update for this part was lower than the amount shown in the so-called July 9, 1985 BOM. Sparano confirmed that this "would be another instance where there would be no defective pricing." (TR. 2377.)

156. The June 27, 1985 Purchasing Update had a unit cost for a filter, part number 61350–24803–101, of $520 for FY

1984, (EX. 150 at 23 (part # 26)), whereas, the government contended, the so-called July 9, 1985 BOM did not list the part. (*See* TR. 2325.)

157. On cross examination, however, Sparano conceded that he had not fully understood the notation in the so-called July 9, 1985 BOM next to part number 61350–24803–106. This notation stated "T/R 101," meaning that the former part was "to read –101." Had Sparano understood this, he would have known that the so-called July 9, 1985 unit price for the filter, part number 61350–24803–101, would in fact be higher than that listed for the same part in the June 27, 1985 Purchasing Update. Sparano agreed that this would be yet "another instance where [he] would not cite [Sikorsky] for defective pricing." (TR. 2406.)

158. The government also introduced evidence with respect to four parts that were not found in Yates' post-negotiation BCM. (TR. 2327–28, 2427; EX. 150 at 32–35.) These parts are a bolt, part number NAS625–25; a spirolox, part number RR–150BX; a spring, part number 61350–24047–101; and a yoke, part number S6135–20643–002. On direct examination Sparano testified that, as to each of these parts, the so-called July 9, 1985 BOM contained unit cost information not otherwise disclosed to the government. (TR. 2528–32.) He also testified that, as to the bolt and the spirolox, there was a quantity difference between what was disclosed in Sikorsky's April 20 Program Update (EX. 6) and the so-called July 9, 1985 BOM. (TR. 2328–29; EX. 15.5.)

159. On cross-examination, Sparano admitted that his testimony regarding the failure to disclose the proper quantities for the bolt and the spirolox was not correct. As to both parts, Sikorsky disclosed in the April 20 Program Update the same quantity which appeared in the so-called July 9, 1985 BOM. (TR. 2429–30, 2431.)

160. The government contended that Sikorsky had failed to disclose to the Navy the unit costs for these parts found in the so-called July 9, 1985 BOM. As to the bolt, part number NAS625–25, the so-called July 9, 1985 BOM showed in the "Adjusted Cost" column the designation "N/C" and in the "Cost Per Kit" column a "0.00." (TR. 2428, 4061; EX. 15.5.) Sparano noted that, as to this part, Sikorsky had included in the so-called July 9, 1985 BOM the comment "Probably U/R [Unrestricted] Delet[e] Cost." (TR. 2428; EX. 15.5.) He indicated uncertainty that the "N/C", or no cost, designation and the "0.00" Cost Per Kit amount were, when considered in light of the "Probably U/R Delet[e] Cost" comment, judgments. (TR. 2428.) Madden testified, (TR. 4061, 4105), that the unit price for this part was purely a judgment. Therefore, the government has failed to show that the zero unit cost for this part found in the so-called July 9, 1985 BOM is within the definition of cost or pricing data.

161. Regarding the spirolox, part number RR–150BX, the so-called July 9, 1985 BOM shows an "N/C" (no charge) in the "Adjusted Cost" column and a "0.00" in the "Cost Per Kit" column. Madden testified that, despite the showing that there was a purchase order for that part and 0.77¢ found in the "Base Cost" column, for this part he "made a judgment" when he put the "N/C" in the adjusted cost column and the "0.00" in the Cost Per Kit column. (TR. 4063.) The Court agrees. Therefore, this unit cost information likewise is not cost or pricing data requiring disclosure. Furthermore, as to both the bolt and the spirolox, the government failed to sustain its burden of proving reliance.

162. The government contended that the unit cost for the spring, part number 61350–24047–101, shown for both FY 1985 and FY 1986 in the so-called July 9, 1985 BOM was cost or pricing data which had not been previously disclosed. (TR. 2329.) On cross examination, Sparano testified that the June 19, 1985 Commitment Report showed a unit cost of "$542.700/M," or $542.70 per thousand. (TR. 2433; EX.

110.) He acknowledged that if one mistakenly did not see the first digit, "5," then one could see the part's cost as 42 cents. (TR. 2433–34.)

163. While the Court is not inclined to agree with that observation (see TR. 2935–36), there is nothing in the record to support a conclusion that the 0.42¢ amount listed in the so-called July 9, 1985 BOM was a verifiable fact. The figure of 0.42¢ appears in no other document in evidence. Further, even if it were based in fact, such a small adjustment would not have had a significant impact on the negotiated contract price. The differential between the disclosed unit price and the undisclosed amount is only 12 cents. The total cost impact (unburdened and without profit) amounts to less than $33.00.

164. The government contended that the unit cost of $111.24 shown for the yoke, part number S6135–20643–002, for both FY 1985 and FY 1986 in the so-called July 9, 1985 BOM was cost or pricing data which had not been previously disclosed. (TR. 2330.) On cross examination, however, Sparano testified as to the similarity of the part numbers for the yoke and the part listed just below it, a steel forging. He also acknowledged that the $111.24 amount found for the yoke in the so-called July 9, 1985 BOM was the same unit cost as that listed for the steel forging, the part immediately below it, in the April 20 Program Update. (TR. 2440; EX. 6.) Given that the unit cost of $111.24 for the yoke is not found in any other document (TR. 2330), it appears that the $111.24 figure for the yoke was an error. The Court credits Madden's testimony that, although he could not be sure, it appears he picked up the unit cost of the steel forging and used it for the unit cost of the yoke when he prepared the so-called July 9, 1985 BOM. (TR. 4070.) Thus, the government has failed to meet its burden of proving the nondisclosure of current, accurate and complete data regarding the yoke.

## II. CONCLUSIONS

The government alleges that Sikorsky failed to disclose current, accurate and complete cost or pricing data contained within its computer system during the negotiations of the MGBIP. (First Amended Complaint ¶ 11.) The government also alleges that Sikorsky had in its possession on or before July 9, 1985, a bill of materials that it failed to disclose to the Navy negotiator during the negotiations. (First Amended Complaint ¶ 12.) Specifically, the government claims that this bill of materials contained accurate, complete and current cost or pricing data as of July 9, 1985, that was not disclosed to the Navy negotiator. It is the government's contention that this document stated a total material cost estimate of $24.97 million, more than $2 million less than the material cost estimate that the Navy believed was represented by the disclosed non-current, incomplete and inaccurate cost or pricing data. (First Amended Complaint ¶ 12.)

In addition, the government alleges that Sikorsky withheld cost or pricing data concerning parts manufactured by the New York Air Brake Company (N.Y.AB). (First Amended Complaint ¶ 13.) Specifically, the government alleges that as early as May 30, 1985, Sikorsky knew that the two subkits from NYAB were available at a price less than the repeatedly disclosed figure of $860. (First Amended Complaint ¶ 13.)

There are further allegations that Sikorsky's inaccurate disclosures of twenty-four parts were relied upon to track price movement. (First Amended Complaint ¶ 14.) Finally, the government alleges that due to Sikorsky's false Certificate of Current Cost or Pricing Data, the government overpaid Sikorsky at least $3,943,717, and that this overpayment was received by Sikorsky from its submission of approximately 200 DD Form 250s and invoices requesting payment. (First Amended Complaint ¶ 15.)

The government's complaint contains four counts. The claims are violations of

the False Claims Act ("FCA"), 31 U.S.C. § 3729, and the Truth in Negotiations Act ("TINA"), 10 U.S.C. § 2306(f), unjust enrichment, and payment by mistake.

## A. The Truth In Negotiations Act

██ "The government has the burden of proof in a defective pricing case. As a general matter, this entails proving three elements by a preponderance of the evidence. First, it must establish that the information at issue is 'cost or pricing data' within the meaning of the Truth In Negotiations Act, 10 U.S.C. § 2306(f). Second, the government must show that the cost or pricing data was either not disclosed or not meaningfully disclosed to a proper government representative. Third, it must demonstrate detrimental reliance on the defective data and show by some reasonable method the amount by which the final negotiated price was overstated.... Upon proof of nondisclosure or the use of inaccurate or noncurrent cost or pricing data, the government is aided in meeting its burden of establishing that there was a significant overstatement in the contract price by a rebuttable presumption that the 'natural and probable consequence' of the nondisclosure or the use of noncurrent or inaccurate cost or pricing data is an increase in the contract price. The [defendant] must then show that the defective data was not relied upon or that the undisclosed data would not have been relied upon even if there had been complete disclosure. *Sylvania Elec. Prods., Inc. v. United States*, 202 Ct.Cl. 16, 479 F.2d 1342, 1349 (1973); *S.T. Research Corp.*, ASBCA No. 29070, 84–3 BCA ¶ 17,568, at 87,548. The government, nevertheless, retains the ultimate burden of showing a causal connection between the undisclosed or defective data and an overstated contract price." *Appeal of Rosemount, Inc.*, ASBCA No. 37520, 95–2 BCA 27,770, 1995 WL 373578, at *17–18 (Jun. 19, 1995).

"To prevail, [the government] must establish that [Sikorsky] failed to disclose accurate, complete and current cost or pricing data; that the data not disclosed involved significant sums; and that [the government] relied upon the inaccurate, incomplete, or noncurrent data, thus establishing the causal relationship between the incorrect data and the final negotiated price." *Appeal of Texas Instruments, Inc.*, ASBCA No. 23678, 87–3 BCA 20,195, 1987 WL 41361, at *143 (Sep. 28, 1987).

As in effect on July 9, 1985, TINA did not include a definition of "cost or pricing data." Instead, a definition was found in the Federal Acquisition Regulation, which provided that "cost or pricing data" are:

> [A]ll facts as of the time of the price agreement that prudent buyers and sellers would reasonably expect to affect price negotiations significantly. Cost or pricing data are factual, not judgmental, and are therefore verifiable. While they do not indicate the accuracy of the prospective contractor's judgment about estimated future costs or projections, they do include the data forming the basis for that judgment. Cost or pricing data are more than historical accounting data; they are all the facts that can reasonably be expected to contribute to estimates of future costs and to the validity of costs incurred. They also include such factors as (a) vendor quotations ... and (h) information on management decisions that could have a significant bearing on costs.

48 C.F.R. § 15.801 (April 1984.)

██ The government has alleged violations of the Truth In Negotiations Act as follows: First, failure of Sikorsky to disclose to the Navy, prior to the price agreement on July 9, 1985, current, accurate and complete cost or pricing data (First Amended Complaint ¶ 11); Second, failure of Sikorsky to disclose to the Navy, prior to the price agreement on July 9, 1985, cost or pricing data contained within the so-called July 9, 1985 BOM (First Amended Complaint ¶ 12); Third, failure of Sikorsky to disclose price quotes from NYAB lower than those given to the Navy

during negotiations. (First Amended Complaint ¶ 13.)

This Court finds that the so-called July 9, 1985 BOM did not exist on or before July 9, 1985, but was created by Sikorsky in order to respond to DCAA's request for a certified bill of materials. As a result of this conclusion, the Court will only address the government's claim that Sikorsky had cost or pricing data on or before July 9, 1985, that it did not disclose to the Navy, and not the claim that the data existed in the form of the so-called July 9, 1985 BOM on that date.

In arguing that a violation of the Truth In Negotiations Act exists, the government's case focused on the idea that the document Sikorsky delivered to the DCAA in November, 1985, the so-called July 9, 1985 BOM (EX. 15.5), contained cost or pricing data that was not disclosed to the Navy before the July 9, 1985 agreement on price. Except for the NYAB parts, the government's theory of nondisclosure is premised on the contention that it discovered, within the so-called July 9, 1985 BOM, the alleged undisclosed data. In addressing the remaining claim under TINA, the Court will reference data found in the so-called July 9, 1985 BOM, only as it relates to the government's theory that undisclosed cost or pricing data existed, and not that the document itself existed or should have been turned over prior to the agreement on price.

In Paragraph 14 of the First Amended Complaint, the government alleged that Sikorsky delivered inaccurate data regarding quantities and prices in its June 27, 1985 purchasing update. On July 31, 1997, this Court ruled that Sikorsky could not be held liable for a TINA violation on the basis of the allegedly incorrect quantities contained in the June 27, 1985 purchasing update. This Court found that Yates used the January 2, 1985 purchasing update in creating his post-negotiation clearance report and that he offered no testimony that he relied on the June 27, 1985 purchasing update in determining quantities in his

negotiations with Sikorsky. (Ruling on Defendant's Motion for Judgment on Partial Findings as to ¶ 14 of the First Amended Complaint, July 31, 1997.) This ruling did not affect the government's allegations in Paragraph 14 concerning unit prices. Thus, the government's claims in Paragraph 14 of the First Amended Complaint fail as to the quantity allegations.

Paragraph 14 of the First Amended Complaint alleged that the June 27, 1985 purchasing update contained false unit prices for the following parts and years, because the prices listed were allegedly higher than those found in the so-called July 9, 1985 BOM: (1) an actuator, part number 61350-24802-101, for fiscal years 1984 and 1985; (2) a housing, part number 61350-24060-103, for fiscal year 1984; (3) a bearing, part number sb2106-103, for fiscal year 1985; and (4) a forging, part number 61350-24051-001, for fiscal year 1986. Also, at trial the government presented evidence that the so-called July 9, 1985 BOM reflected lower prices for four other parts: (1) a bolt, NAS625-25, FY 1984; (2) a spirolox, RR-150BX, FY 1984; (3) a spring, 61350-24047-101, FY 1985 and 1986; and (4) a yoke, S6135-20643-002, FY 1985 and 1986.

With respect to the actuator, the government claimed that the unit price listed for that part in the June 27, 1985 Purchasing Update was $64.00 higher for FY 1984 and $134.60 higher for FY 1985 than the amounts found in the undisclosed, so-called July 9, 1985 BOM. The government's witness, Sparano, conceded at trial, that the FY 1984 unit cost listed in the June 27, 1985 Purchasing Update reflected the most current, accurate and complete information. (TR. 2365-68.) The lower unit cost information the government claims it found in the so-called July 9, 1985 BOM is incorrect. (TR. 2366.) Relative to the FY 1984 cost information for the actuator, Sikorsky met its obligation to disclose current, accurate and complete cost or pricing data.

As to the FY 1985 unit cost for the actuator, Sparano acknowledged that the so-called July 9, 1985 BOM did not list any specific cost information, (TR. 2397), and that the amount claimed to be from the so-called July 9, 1985 BOM (EX. 150 at 21) was the result of his own calculation. The government failed to show that the unit cost listed for the part in the June 27, 1985 Purchasing Update, which was the same as that listed in the June 19, 1985 Commitment Report, was not the correct unit cost. This Court concludes that the government has failed to show that Sikorsky did not disclose current, accurate or complete cost data as to the FY 1985 actuator.

With respect to the housing, the government alleged in the Amended Complaint that the unit cost listed in the so-called July 9, 1985 BOM for FY 1984 was $1.36 lower than that reflected in the June 27, 1985 Purchasing Update. Even if this small difference were not attributable to rounding, as Sparano testified it could be, the total cost differential would only be $146.88. (Finding 141.) This Court concludes that the difference is attributable to rounding and does not rise to a violation of TINA.

The government also failed to show that the so-called July 9, 1985 BOM's FY 1985 unit cost for the bearing was current, accurate or complete cost or pricing data. Sparano admitted at trial that the amount listed in the so-called July 9, 1985 BOM was a weighted average, and that he did not verify its source. (TR. 2414; Finding 143.) Sikorsky, on the other hand, presented evidence establishing that the weighted averages in the June 27, 1985 Purchasing Update and the so-called July 9, 1985 BOM were calculated using different purchase order data. The government, after acknowledging that it did not know which of the two weighted averages was correct (TR. 2419), failed to present any evidence addressing the issue. (Findings 144–145.) Without engaging in speculation, based on this record the Court cannot determine which of the two documents

contained the correct data. Accordingly, the government did not meet its burden of proof relative to the bearing, because it failed to establish that current, accurate and complete cost or pricing data was not disclosed. *See, e.g., Appeal of Texas Instruments, Inc.,* ASBCA No. 30836, 89–1 BCA 21,489, 1988 WL 134394 (Nov. 7, 1988) (stating that the government bears the burden of proving that the contractor failed to disclose accurate, complete and current pricing data).

Finally, the government has failed to prove its contention that the so-called July 9, 1985 BOM's FY 1986 price for the forging was cost or pricing data. Sparano testified that the so-called July 9, 1985 BOM did not list a FY 1986 price for the forging, and that the allegedly lower amount was the unescalated 1985 purchase order amount for the part. (Finding 148.) The June 27, 1985 Purchasing Update, on the other hand, listed a quotation for that part for FY 1986. Quotations are cost or pricing data, while judgments are not. *See* 10 U.S.C. § 2306a(h)(1)(1996) (defining cost or pricing data, specifying that "such term does not include information that is judgmental ...."); FAR § 15.801 (1985) ("cost or pricing data are factual, not judgmental ..."); *Litton Sys., Inc.,* ASBCA No. 36509, 92–2 BCA 24842, 1992 WL 42752 at *17 (Feb. 26, 1992) ("Cost or pricing data is factual; not judgmental, and is therefore verifiable."); *Lockheed Aircraft Corp.,* ASBCA No. 10453, 67–1 BCA 6356, 1967 WL 573 at *34 (May 18, 1967) ("The kind of data envisioned by [TINA] must be factual and verifiable as against the kind that is speculative in nature or is an estimate or judgment"). The government did not explain why the unit cost Sparano derived from the so-called July 9, 1985 BOM, which was based on the judgment not to apply escalation to the purchase order for 1985 parts, should take precedence over the quotation reflected in the June 27, 1985 Purchasing Update. (Finding 148.) In the absence of such an explanation this Court concludes that the

government did not establish the nondisclosure of cost or pricing data pertaining to the FY 1986 unit cost of the forging.

As noted above (Finding 161), although it did not include them in the Amended Complaint, at trial the government adduced evidence suggesting that Sikorsky failed to disclose current, accurate and complete unit price information relative to four additional parts. Regarding two of those parts, the bolt (NAS625–25) and the spirolox (RR–150BX), the Court concludes that the notations "N/C" (no charge) and "$0" cost in the so-called July 9, 1985 BOM reflected judgments, not facts. (Findings 160–161.) By definition, judgments are not cost or pricing data.

The third part in this category is the spring (61350–24047–101), for which the so-called July 9, 1985 BOM listed a unit cost of 0.42¢ as opposed to the 0.54¢ that appears in the June 19, 1985 Commitment Report. (Findings 162–163.) While the evidence is insufficient for the Court to determine whether the amount in the so-called July 9, 1985 BOM was correct, the Court finds that, even if it were, because the total price differential is only $33.00, it could not have had a significant impact on price. *See Rose, Beaton & Rose*, PSBCA No. 459, 80–1 BCA 14242, 1980 WL 2258 (Jan. 10, 1980) (holding that government was not entitled to recover for defective pricing because contractor's erroneous inclusion of $209,825 in its proposed overhead did not have a significant impact on price).

With respect to the yoke (S6135–20643–002), it became apparent during trial that the amount in the so-called July 9, 1985 BOM, far from being "accurate and complete," was a mistake. The unit price in the so-called July 9, 1985 BOM was in fact a transposition error. (Finding 164.) The government failed to meet its burden of proving the nondisclosure of current, accurate and complete data regarding the yoke.

Except for the NYAB pricing information, to which Sikorsky has conceded liability, the government has failed to sustain its burden of establishing that Sikorsky violated TINA. The evidence produced at trial fails to prove by a preponderance of the evidence that Sikorsky failed to disclose to the Navy accurate, current and complete cost or pricing data. In addition, the government has failed to prove that the so called July 9, 1985 BOM existed on or before the July 9, 1985 agreement on price excluding warranty.

Even if it can be said that Sikorsky failed to disclose cost or pricing data, the government has also failed to prove that the data not disclosed involved significant sums. The government has failed to establish a reasonable basis to determine the overstated price, if any. The government offered no analysis and proof, on an item by item basis, of the alleged inaccurate disclosures and failed to establish a specific substantial sum supported by the evidence.

Finally, even if this Court were to assume that Sikorsky did not disclose accurate, current and complete cost or pricing data involving a significant sum, the government has failed to sustain its burden to prove that it relied upon the inaccurate, incomplete, or noncurrent data, so as to establish a causal relationship between the incorrect data and the final negotiated price. Sikorsky has rebutted the presumption that is said to exist in a case where the government has carried its burden of proving nondisclosure. For these reasons, this Court holds that, except for the NYAB claims, the government has failed to prove that Sikorsky violated the Truth in Negotiations Act.

## B. *TINA DAMAGES*

██ Having determined that the only TINA violation proven by the government relates to the NYAB modification kits, it is necessary to determine damages.

When it is determined that defective cost or pricing data has been provided to the government, as of the date of final

agreement on price, "the government is entitled to a price adjustment, including profit or fee, of any significant amount by which the price was increased because of the defective data." 48 C.F.R. § 15.804–7(b)(1); DAR § 3–807.10(a). The government is entitled to the amount disclosed minus the amount undisclosed. Thus, the government is entitled to reduce the price of the contract by the amount of Sikorsky's overstatement of the NYAB modification kits. Against this amount, Sikorsky is entitled to offset, to the extent of that overstatement, any understated cost or pricing data submitted in support of price negotiations. *Lockheed Aircraft Corp. v. United States*, 193 Ct.Cl. 86, 432 F.2d 801 (1970); *Cutler–Hammer Inc. v. United States*, 189 Ct.Cl. 76, 416 F.2d 1306 (1969); 48 C.F.R. § 15.804–7(b)(4). Finally, TINA provides for the recovery of interest on overpayments made by the government. 10 U.S.C. § 2306a(f)(1)(A).

The price of the NYAB modification kits used during negotiations was $860 per kit. This is undisputed. The parties disagree, however, as to the amount of the overstatement in price. Specifically, the parties disagree as to the amount which was undisclosed.

Sikorsky's CPA Report # 4446, which was written upon completion of the June, 1985 NYAB fact-find, contained three sets of prices: (1) the price quotations given by NYAB to Sikorsky, $226.59 and $213.60 for the two different kit numbers; (2) recommended as optimal, the prices of $156.00 and $146.00; and (3) recommended as maximum, the prices of $166.00 and $155.00. (EX. 29.)

The government argues that the proper amounts to use for determining the price adjustment are those listed as maximum. Yates testified that, had he received CPA Report # 4446, he would have incorporated some of its conclusions into his cost model. (TR. 1724.) He also stated that he would have inquired as to whether there was some method to determine where Sikorsky usually settled between optimum and maximum, and would have done so. (TR. 1724.) If not, he testified he probably would have used the maximum price. (TR. 1724.)

Sikorsky, on the other hand, argues that the proper amount to use is a 10.3 percent reduction of the price quotations given by NYAB. In determining this figure, Sikorsky relies on Yates's pre and post-negotiation BCMs, which state that in estimating material costs he reduced quotations by 10.3 percent. Therefore, Sikorsky argues that the natural and probable consequence of disclosure of CPA Report # 4446 would have been Yates' reduction of the quotations by 10.3 percent, resulting in the amounts of $203.25 and $191.60 for the NYAB parts. Sikorsky also contends that because this Court previously ruled that the prices recommended in the Report were not cost or pricing data, they are not a proper basis for determining the amount of the defect. *See* Ruling on Def.'s Mot. For Partial Sum. J. On Cost or Pricing Data, July 8, 1997 at 10. Sikorsky cites no authority for this position. The Court agrees with the government that Sikorsky is confusing liability with damages.

■ The burden on the government is to show "by some reasonable method the amounts by which the final negotiated contract was overstated." *Appeal of the Boeing Company*, ASBCA No. 33881, 92–1 BCA 24,414, 1991 WL 185209 at *11 (Feb. 14, 1991). "This determination necessarily requires speculation as to what the parties would have done if the undisclosed [data] had been disclosed during negotiation of the contract price. *American Machine & Foundry Co.*, ASBCA No. 15037, 74–1 BCA 10,409, 1973 WL 1508 (1973)." *Appeal of Rogerson Aircraft Controls*, ASBCA No. 27954, 85–1 BCA 17,725, 1984 WL 13769 at *9 (Oct. 15, 1984). "While we recognize the speculative nature of the evidence available to prove what a negotiator would have done had he had certain data (a difficulty, we observe, that is inherent in this kind of case), we think that the record here amply supports the reasonableness of

the damages asserted by respondent." *Appeal of Lambert Engineering Company,* ASBCA No. 13338, 69-1 BCA 7663, 1969 ASBCA LEXIS 77 at *26 (Apr. 30, 1969).

In this case, the Court concludes that the amounts of $166.00 and $155.00 claimed by the government are within the zone of reasonableness, in light of all the circumstances of this case. The Court holds that the amount of the NYAB defective pricing is $635,022.00. *See* Appendix 1.

Against this amount, Sikorsky presented evidence and proved $496,369.00 in valid offsets. (EXs.598, 599, 738) Subtracting the amount of the offsets from the $635,-022.00 discussed above results in a net defective pricing of $138,653.00. In addition to the $138,653.00, the government is entitled to recover the related burdens and profits. The Court finds that, with the related burdens and profit, the amount of the total defective pricing is $196,639.53.[5] *See* Appendix 2.

The remaining issue to resolve with regard to the calculation of damages is whether the government is entitled to interest. Sikorsky makes two arguments against the government's entitlement to interest.

 First, Sikorsky argues that the amendment to TINA that authorized interest on overpayments was originally passed in 1985, and applied only to contracts. In 1986, another amendment was enacted making the interest provision applicable to modifications as well, specifying that the amendment applied to contracts or modifications of contracts entered into after November 7, 1985. Sikorsky contends that this case is based on Modification P00013 which it claims it entered into on October 9, 1985, before the November 7, 1985 effective date. While Modification P00013 was signed by Sikorsky on October 9, 1985, the Navy did not sign it until January 17, 1986.

This Court finds that Modification P00013 was entered into on January 17, 1986. (Findings 54–56.)

 Second, Sikorsky argues that it made repayment to the government on April 15, 1988. Because the interest provision specifies that the government is entitled to interest from the date the overpayment was made to the contractor to the date of the contractor's repayment, Sikorsky contends that the government is not entitled to interest beyond April 15, 1988. The government returned Sikorsky's check on April 28, 1988. Thereafter, Sikorsky again sent a check to the government for the purposes of repayment on May 26, 1988. This second check was not returned to Sikorsky until August 15, 1989, almost fifteen months later.

Accompanying the first check for repayment was a letter. Contained in that letter was language that appeared to prejudice the government's rights had it accepted payment. (Finding 104.) In the second attempt at repayment, Sikorsky attempted to clarify its intent with regard to the first letter and specifically stated that it was not attempting to prejudice the rights of either party. (Finding 106.)

Sikorsky cites *Silver v. United States,* 202 F.Supp. 1 (N.D.N.Y.1962), in support of its claim. In *Silver,* "the court applied the theory that interest is not to be allowed where, by act of the creditor, payment of a debt has been prevented. The government was held not entitled to interest on a proffered partial satisfaction of a jeopardy assessment after a reasonable time in which it should have acted upon the proffered payment." *Cibelli v. United States,* 585 F.Supp. 799, 801 (D.Conn. 1984). The government argues that the Court should decline to follow *Silver* and instead follow *Cibelli.* In *Cibelli,* the court distinguished *Silver* by acknowledging that in *Silver* there was an offer of payment,

5. This figure was based on the methodology used by the parties as demonstrated in Exhib- its 149A, 171, and 738.

where as in the case before it there was no offer of payment. Furthermore, the court stated that the fact that the plaintiff retained the use of his money for the period in question precluded relieving him of the obligation to pay interest for that time period.

In this case, Sikorsky made an attempt at repayment on two separate occasions. While the first effort appeared prejudicial to the government's interests, the second effort attempted to clarify Sikorsky's intent and was not rejected for some fifteen months. Although the government argues that Sikorsky never lost the use of its money, Sikorsky was not aware of the status of these funds until the check was returned in August, 1989.

The Court finds that the government is entitled to interest. The running of interest, however, was tolled between May 26, 1988, and August 15, 1989. The Court holds that the government is entitled to $108,088.88 in interest.[6] *See* Appendix 3.

Thus, on Count II of the Amended Complaint the government is entitled to $196,-639.53 in damages due to Sikorsky's liability for violating TINA with regard to the undisclosed NYAB modification kits cost or pricing data. In addition, the government is also entitled to interest in the amount of $108,088.88.[7]

## C. *False Claims Act*

■■■ In its amended complaint, the government alleged that Sikorsky violated the False Claims Act, 31 U.S.C. § 3729 et seq (FCA). Specifically, the government alleged that Sikorsky violated sections 3729(a)(1) and (2), which provide that:

Any person who—

(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false and fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government

\* \* \* \* \* \*

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person . . . .

31 U.S.C. § 3729(a).

■■■ "The elements of a claim under § 3729(a)(1) are: (1) that the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) that the claim was false or fraudulent; (3) that the defendant knew that the claim was false or fraudulent; and (4) that the United States suffered damages as a result". U.S. *ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Provident Life & Accident Ins. Co.,* 721 F.Supp. 1247, 1258–59 (S.D.Fla.1989).

■■■ "The elements of a claim under § 3729(a)(2) are: (1) that the defendant made, used, or caused to be made or used, a record or statement to get a claim against the United States paid or approved; (2) the record or statement and the claim were false or fraudulent; (3) the defendant knew that the record or statement and the claim were false or fraudulent; and (4) the United States suffered

---

6. The interest amount was calculated based on those public vouchers the government identified as involving the delivery of NYAB units. (EX. 146, 614A.) There were a total of fifteen public vouchers produced by the government accounting for 519 of the 905 NYAB units actually delivered. (EX. 614A, 171.) Because the government failed to produce any evidence establishing when payment was

made for the remaining 386 units, the amount of interest due in connection with the defective pricing amount attributable to those units could not be determined.

7. This amount was calculated through June 7, 1999. Interest will continue to accrue until repayment is made.

damages as a result. *Id.* at 1259." *Wilkins ex rel. United States v. Ohio,* 885 F.Supp. 1055, 1059 (S.D.Ohio 1995).

The government is required to prove an element of knowledge for each of the sections of the statute. Section 3729(b) states that:

> For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information—
>
> (1) has actual knowledge of the information;
>
> (2) acts in deliberate ignorance of the truth or falsity of the information; or
>
> (3) acts in reckless disregard of the truth or falsity of the information,
>
> and no proof of specific intent to defraud is required.

31 U.S.C. § 3729(b).

 "Innocent mistake is a defense to the ... civil complaint. So is mere negligence. The statutory definition of 'knowingly' requires at least 'deliberate ignorance' or 'reckless disregard.'" *United States ex rel. Hagood v. Sonoma County Water Agency,* 929 F.2d 1416, 1421 (9th Cir.1991). "[W]hat constitutes the offense is not intent to deceive but knowing presentation of a claim that is either 'fraudulent' or simply 'false.' 31 U.S.C. § 3729(a)(1) and (2). The requisite intent is the knowing presentation of what is known to be false." *Id.* "[W]e agree with *Hagood* that the statutory basis for an FCA claim is the defendant's knowledge of the falsity of its claim, see § 3729(a) & (b)." *United States ex rel. Kreindler & Kreindler v. United Technologies Corporation,* 985 F.2d 1148, 1156 (2d Cir.1993).

With respect to section 3729(a)(1), the government alleged that Sikorsky and Madden knew that the July 25, 1985 Certificate of Current Cost or Pricing Data was false when it was submitted to the Navy. As a result of this false certificate, the government claims that it overpaid Sikorsky and that Sikorsky received this overpayment when it submitted invoices for payment that sought the amount by which the contract price had been inflated. As to section 3729(a)(2), the government argues that Sikorsky made the Certificate of Current Cost or Pricing Data to get a claim against the United States paid, that the Certificate was false, that Sikorsky knew the Certificate was false, and that the government suffered damages as a result. In addition, the government appears to argue that Sikorsky made other false statements during the course of negotiations and that it should be held liable for them.

Sikorsky claims that it did not violate the False Claims Act. Although it admits to violating the Truth In Negotiations Act with respect to the pricing of the New York Air Brake modification kits, Sikorsky argues that neither its Certificate nor any of its claims was knowingly false or fraudulent.

 As the Second Circuit has stated, it is the defendant's knowledge of the falsity of its claim that is the statutory basis for a claim under the False Claims Act. *Id.* The government has the burden of proving by a preponderance of the evidence that Sikorsky knowingly presented a false claim to the government and that it knowingly made a false statement to get a claim it knew was false paid or approved.

 The government claims that Sikorsky's liability under the False Claims Act is based on its corporate knowledge of the falsity of the Certificate of Current Cost or Pricing Data. Specifically, the government argues that, in order to impose liability on Sikorsky under the False Claims Act, the government need only show that one employee at Sikorsky had actual knowledge of the company conduct (possession of more accurate, more current or more complete cost or pricing data) and that another employee knew of the duty to collect that information and report such data accurately and completely to the Navy.

The government contends that employees of Sikorsky possessed cost or pricing

data relating to NYAB that included quotations of lower prices for the NYAB kits and a Cost Price Analysis Report that was. written after a Sikorsky employee conducted a fact find at NYAB. In addition, the government claims that Madden, Sikorsky's negotiator and signer of the Certificate, knew that the Certificate was false and that current, accurate and complete cost or pricing data was not disclosed to the Navy.

In support of its theory of applying the corporate knowledge doctrine to Sikorsky, the government makes the following arguments: (1) the Certificate contained language informing Sikorsky that it was liable for the collective knowledge of all of its employees; (2) the application of the collective corporate knowledge doctrine in cases like this is well recognized; and (3) Sikorsky and other companies continue to submit updated cost or pricing data to the government with the delivery of the Certificate after the negotiations are complete in order to avoid corporate liability.

The language the government refers to contained in the footnote of the Certificate is as follows:

> The responsibility of the contractor is not limited by the personal knowledge of the contractor's negotiator if the contractor had information reasonably available at the time of agreement, showing that the negotiated price is not based on accurate, complete and current data.

(EX. 120 at 282.) The government contends that this language warned Sikorsky that it was responsible for any knowledge it had pertaining to accurate, complete and current data. Further, the government contends that it can rely on this language alone and not the common law doctrine of corporate knowledge to impose liability on Sikorsky under the False Claims Act. Sikorsky argues that this language applies to a violation of the Truth In Negotiations Act and is not applicable to imputing corporate knowledge for a violation of the False Claims Act.

This Court does not find the language quoted above dispositive as to Sikorsky's liability under the False Claims Act. Whether or not the collective knowledge of Sikorsky's employees is to be imputed to Sikorsky is not-dependent on the fact that this language was contained in the Certificate. If the collective knowledge doctrine is to be applied to Sikorsky in this situation, the fact that this language existed in the Certificate is irrelevant.

This Court disagrees with the government's assertion that the application of the collective corporate knowledge doctrine in cases like this is well recognized. This case involves a violation of the Truth In Negotiations Act by Sikorsky in not disclosing cost or pricing information relating to the NYAB modification kits. Sikorsky has admitted to this violation. This Court has found no act of fraud on the part of Sikorsky or any of its employees. The case law does not support the government's assertion that in a case like this the doctrine's application is well recognized.

The government relies on two cases involving violations of the False Claims Act for its contention that the corporate knowledge doctrine should apply. *United States v. Foster Wheeler*, 447 F.2d 100 (2d Cir. 1971) and *United States v. Cooperative Grain and Supply Co.*, 476 F.2d 47 (8th Cir.1973). After reviewing both cases, this Court does not agree that they support government's position. In *Foster Wheeler*, the Second Circuit affirmed the district court's decision to apply the FCA to the facts of that case. The district court found actual fraud on the part of the defendant. Specifically, the district court found that the defendant intentionally submitted false information to the Navy in order to conceal a mark-up designed to insure excessive profits. There was no application of the collective corporate knowledge doctrine in that case.

In *Cooperative Grain and Supply Co.*, the defendants were found to have violated the FCA by obtaining commodity price support payments for purchased grain in-

stead of produced grain, as required. The defendants included a grain storage cooperative, its managing officer and a number of grain producers. The managing officer was found to have intentionally defrauded the government because he knew of the proper requirements. The individual grain producers were held to be extremely careless and foolish and "[t]he extreme carelessness in this case amounted to 'knowing,'" for purposes of the FCA. *Cooperative Grain and Supply Co.*, 476 F.2d at 60. Although the opinion contains an informative discussion on satisfying the FCA requirement of "knowing," it neither discusses the collective corporate knowledge doctrine nor applies it to the facts of that case.

A review of the legislative history concerning the 1986 Amendments to the False Claims Act reveals an attempt by Congress to clarify the Act's knowledge requirement. A split in the circuit courts had developed over whether an intent to deceive the government was a necessary element of proof under the FCA. *See, e.g., United States v. Aerodex, Inc.*, 469 F.2d 1003, 1007 (5th Cir.1972) (intent required); *United States v. Ueber*, 299 F.2d 310 (6th Cir.1962) (same); *United States v. Mead*, 426 F.2d 118 (9th Cir.1970) (same); *United States v. Hughes*, 585 F.2d 284, 287–88 (7th Cir.1978) (intent not required); *United States v. Cooperative Grain and Supply Co.*, 476 F.2d 47 (8th Cir.1973) (intent not required).

The comments of some of the sponsors of the amendments to the FCA are instructive. Senator Grassley, the Senate sponsor of the bill, explained the knowledge standard as follows:

> While throughout consideration of this bill there has been general agreement that liability should attach to one who "knows or has reason to know" of the falsity of his claim, debate has focused on the specific standard to be used to define "reason to know" or constructive knowledge. The fundamental issue in designing a standard of knowledge is to reach not only defendants with actual knowledge of a false claim, but also defendants who insulate themselves from that knowledge which a prudent person should have before submitting a claim to the Government. It is this problem of defining constructive knowledge, or of dealing with the "ostrich"—the individual who ignores or fails to inquire about readily discoverable facts which would alert him that fraudulent claims are being submitted—that has led to various formulations of the standard of knowledge.

> \* \* \* \* \* \*

> While the committee expressed in its report accompanying S. 1562 that mistake, inadvertence or mere negligence in the submission of a false claim would not be actionable under the bill, concerns, stemming mainly from the Government contracting community, were raised that such examples of mere negligence might be construed as grossly negligent acts.

> To address those concerns, I, along with the other sponsors of this bill, have agreed to return to a "reckless disregard" standard, but only with the express qualification that "no proof of specific intent is required." Our intent in returning to the reckless disregard standard is only to assure that mere negligence, mistake, and inadvertence are not actionable under the False Claims Act. In doing so, we reconfirm our belief that reckless disregard and gross negligence define essentially the same conduct and that under this act, reckless disregard does not require any proof of an intentional, deliberate, or willful act.

132 CONG. REC. S11238–04 (daily ed. August 11, 1986) (statement of Sen. Grassley). Representative Berman, the House of Representatives's chief sponsor, stated:

> The bill adopts the Senate version of the knowledge standard that must be found to establish liability under this Act. It expressly acknowledges that no proof of specific intent to defraud the govern-

ment is required. There have been some erroneous court decisions that have misapplied the law in the past to require an intent to defraud. The language specified in this section of the law is intended to clarify what has been the law which has been properly interpreted in the case of *United States v. Cooperative Grain and Supply*, 476 F.2d 47, 56 (8th Cir.1973). Subsection 3 of Section 3729(b) uses the term "reckless disregard of the truth or falsity of the information" which is no different than and has the same meaning as a gross negligence standard that has been applied in other cases. While the Act was not intended to apply to mere negligence, it is intended to apply in situations that could be considered gross negligence where the submitted claims to the Government are prepared in such a sloppy or unsupervised fashion that resulted in overcharges to the Government. The Act is also intended not to permit artful defense counsel to require some form of intent as an essential ingredient of proof. This section is intended to reach the "ostrich-with-his-head-in-the-sand" problem where government contractors hide behind the fact they were not personally aware that such overcharges may have occurred. This is not a new standard but clarifies what has always been the standard of knowledge required.

132 CONG. REC. H9382–03 (daily ed. October 7, 1986) (statement of Rep. Berman). It is discernible that the intent of Congress was to prevent corporations from arguing that they lacked an intent to deceive the government or relying on sloppy procedures to process and verify claims.

This Court does not believe that the facts of this case warrant the use of the collective corporate knowledge doctrine to impute knowledge to Sikorsky under the False Claims Act. The facts in this case establish the following: (1) in May, 1985, NYAB sent to Sikorsky a letter including SF 1411s listing reduced prices for the two modification kits (Finding 119); (2) on June 20, 1985, a Sikorsky cost price analyst visited NYAB to conduct a "fact-find" concerning the May quotations (Finding 120); (3) this same analyst prepared CPA Report # 4446 recommending that Sikorsky seek lower prices than the May quotations (Finding 121); (4) the report was not released to Sikorsky buyers until after its approval on July 16, 1985 (Finding 123); (5) information concerning the lower cost prices for the NYAB modification kits was not forwarded to Mr. Madden or to the Navy (Finding 127); and (6) this was the result of an honest mistake and not some scheme or process on the part of Sikorsky to mislead the government (Finding 128). The government has failed to prove that Madden had any knowledge that the representation made in the Certificate was false. Furthermore, Madden did not act in reckless disregard of the truth or falsity of the representations made in the Certificate. The government has also failed to prove that Sikorsky acted in reckless disregard of the truth or falsity of the Certificate.

The Court concludes that the government has not satisfied its burden of proving that Sikorsky knowingly presented to the government a false claim for payment or approval, or that Sikorsky knowingly made a false statement to get a knowingly false claim paid or approved by the government. The facts of this case do not support an application of the corporate knowledge doctrine to hold Sikorsky liable for the aggregate knowledge of its employees.

Even if the corporate knowledge doctrine were to apply in this case, the Court concludes that Sikorsky is not liable for violations of the False Claims Act. Sikorsky has succeeded in establishing that the facts of this case show that at best Sikorsky's actions were merely negligent, inadvertent or a mistake, and, therefore, not actionable under the FCA.

### D. *Counts III and IV*

■ The third and fourth counts of the amended complaint state common law, quasi-contractual claims of unjust enrichment and payment by mistake and demand restitution of the government's overpayment and rescission of the contract. Because these two common law claims are quasi-contractual, they are inappropriate claims where, as here, there is an express contract. *United States v. EER Systems Corp.*, 950 F.Supp. 130, 133 (D.Md.1996). If the plaintiffs have an adequate remedy at law, such as damages, equitable relief cannot be granted. *SCM Corp. v. Xerox Corp.*, 507 F.2d 358, 363 (2d Cir.1974).

■ In Connecticut, "unjust enrichment is available 'wherever justice requires compensation to be given for property or services rendered under a contract, and no remedy is available by an action on the contract.' *Providence Elec. Co. v. Sutton Place, Inc.*, 161 Conn. 242, 287 A.2d 379, 381 (1971) (citation and internal quotation marks omitted.) ... '[L]ack of a remedy under the contract is a precondition for recovery based upon unjust enrichment.'" *Kerin v. United States Postal Service*, 116 F.3d 988, 993–94 (2d Cir.1997).

In this case, the government and Sikorsky have an express contract that contains a remedy for the submission of defective cost or pricing data. The contract contains the then applicable Defense Acquisition Regulation (DAR) standard clause 7–104.29(a), Price Reduction for Defective Cost or Pricing Data (1970). There is an adequate remedy under the contract. Thus, the government's quasi-contractual claims for relief are improper on the facts of this case.

### ORDERS

(1) Judgment shall be entered in favor of the Plaintiff, United States of America, on Count II of the Amended Complaint. Sikorsky is ordered to pay $196,639.53 in damages to the government, and interest of $108,088.88.

(2) Judgment shall be entered in favor of the Defendant, United Technologies Corporation, Sikorsky Aircraft Division, on the remaining counts of the Amended Complaint, Counts I, III and IV.

SO ORDERED.

**APPENDIX 1**

United States v. United Technologies, Corp.
5:92CV375 (EBB)
Defective Pricing Calculation on NYAB Kits
Contract: N00019–83–C–0364
Modification: P00013

---

| Part Number: | P/N 937522 | P/N 973513 |
|---|---|---|
| **Unit Price:** | | |
| Proposed/Negotiated | $860.00 | $860.00 |
| Undisclosed | $155.00 | $166.00 |
| **Quantity:** | 632 | 273 |
| **Total Price: (Unit Price × Quantity)** | | |
| Proposed/Negotiated | $543,520.00 | $234,780.00 |
| Undisclosed | $97,960.00 | $45,318.00 |
| Computed Defective Pricing | $445,560.00 | $189,462.00 |
| **Total Computed Defective Pricing** | **$635,022.00** | |

**APPENDIX 2**

United States v. United Technologies, Corp.
5:92CV375 (EBB)
Damages Calculation
Contract: N00019–83–C–0364
Modification: P00013

---

| DIRECT MATERIAL: | DAMAGES: | |
|---|---|---|
| Material Part No. 937522(cpa) | $445,560.00 | |
| Material Part No. 937513(cpa) | $189,462.00 | |
| Subtotal Direct Material | $635,022.00 | See Appendix 1 |
| Contractor Offsets | $496,369.00 | |
| Direct Material Less Offsets | $138,653.00 | |
| Material Overhead Rate | 8.60% | |
| Material Overhead | $11,924.16 | |
| Subtotal | $150,577.16 | |
| General Overhead Rate | 11.56% | |
| General Overhead | $17,406.72 | |
| Subtotal | $167,983.88 | |
| Packaging Rate | 3.80% | |
| Packaging | $6,383.39 | |
| Subtotal | $174,367.26 | |
| Cost of Money Material (.068%) | $94.28 | |
| Cost of Money General (.219%) | $329.76 | |
| Subtotal | $174,791.31 | |
| Profit Rate | 12.53% | |
| Profit | $21,848.22 | |
| TOTAL | $196,639.53 | |

## APPENDIX 3

United States v. United Technologies, Corp.
5:92CV375 (EBB)
Interest Calculation on NYAB Defective Pricing Refund
Contract: N00019–83–C–0364
Modification: P00013

| | | |
|---|---|---|
| Total Damages | $196,639.53 | |
| Total Quantity | 905 | |
| Damages Per Unit | $217.28 | |

| PV# | PV Date | EOP | Rate | QTY | Base Amount | Days | Interest |
|---|---|---|---|---|---|---|---|
| 2666 | 04/10/86 | 06/30/86 | 10.00% | 1 | $217.28 | 82 | $4.88 |
| 2887 | 05/22/86 | 06/30/86 | 10.00% | 44 | $9,560.32 | 40 | $104.77 |
| 2954 | 06/05/86 | 06/30/86 | 10.00% | 26 | $5,649.28 | 26 | $40.24 |
| 3087 | 06/23/86 | 06/30/86 | 10.00% | 6 | $1,303.68 | 8 | $2.86 |
| | 07/01/86 | 09/30/86 | 9.00% | | $16,730.56 | 92 | $379.53 |
| | 10/01/86 | 12/31/86 | 9.00% | | $16,730.56 | 92 | $379.53 |
| 3877 | 11/07/86 | 12/31/86 | 9.00% | 28 | $6,083.84 | 55 | $82.51 |
| 4089 | 12/15/86 | 12/31/86 | 9.00% | 3 | $651.84 | 17 | $2.73 |
| TOTAL 1986 | | | | | | | $997.05 |
| | 01/01/87 | 03/31/87 | 9.00% | | $23,466.24 | 90 | $520.76 |
| | 04/01/87 | 06/30/87 | 9.00% | | $23,466.24 | 91 | $526.54 |
| 5098 | 04/16/87 | 06/30/87 | 9.00% | 2 | $434.56 | 76 | $8.14 |
| | 07/01/87 | 09/30/87 | 9.00% | | $23,900.80 | 92 | $542.19 |
| 7060 | 09/04/87 | 09/30/87 | 9.00% | 38 | $8,256.64 | 27 | $54.97 |
| 7182 | 09/25/87 | 09/30/87 | 9.00% | 90 | $19,555.20 | 6 | $28.93 |
| 7184 | 09/25/87 | 09/30/87 | 9.00% | 56 | $12,167.68 | 6 | $18.00 |
| 7188 | 09/25/87 | 09/30/87 | 9.00% | 78 | $16,947.84 | 6 | $25.07 |
| | 10/01/87 | 12/31/87 | 10.00% | | $80,828.16 | 92 | $2,037.31 |
| 7245 | 10/02/87 | 12/31/87 | 10.00% | 90 | $19,555.20 | 91 | $487.54 |
| 7338 | 10/23/87 | 12/31/87 | 10.00% | 46 | $9,994.88 | 70 | $191.68 |
| 7643 | 11/30/87 | 12/31/87 | 10.00% | 10 | $2,172.80 | 32 | $19.05 |
| TOTAL 1987 | | | | | | | $4,460.19 |
| | 01/01/88 | 03/31/88 | 11.00% | | $112,551.04 | 91 | $3,078.24 |
| | 04/01/88 | 05/25/88 | 10.00% | | $112,551.04 | 55 | $1,691.34 |
| | 05/26/88 | 12/31/88 | INTEREST TOLLED | | | | |
| TOTAL 1988 | | | | | | | $4,769.58 |
| | 01/01/89 | 08/14/89 | INTEREST TOLLED | | | | |
| | 08/15/89 | 09/30/89 | 12.00% | | $112,551.04 | 47 | $1,739.14 |
| 2082 | 08/15/89 | 09/30/89 | 12.00% | 1 | $217.28 | 47 | $3.36 |
| | 10/01/89 | 12/31/89 | 11.00% | | $112,768.32 | 92 | $3,126.62 |
| TOTAL 1989 | | | | | | | $4,869.12 |
| | 01/01/90 | 03/31/90 | 11.00% | | $112,768.32 | 90 | $3,058.65 |
| | 04/01/90 | 06/30/90 | 11.00% | | $112,768.32 | 91 | $3,092.63 |
| | 07/01/90 | 09/30/90 | 11.00% | | $112,768.32 | 92 | $3,126.62 |
| | 10/01/90 | 12/31/90 | 11.00% | | $112,768.32 | 92 | $3,126.62 |
| TOTAL 1990 | | | | | | | $12,404.52 |
| | 01/01/91 | 03/31/91 | 11.00% | | $112,768.32 | 90 | $3,058.65 |
| | 04/01/91 | 06/30/91 | 10.00% | | $112,768.32 | 91 | $2,811.48 |
| | 07/01/91 | 09/30/91 | 10.00% | | $112,768.32 | 92 | $2,842.38 |
| | 10/01/91 | 12/31/91 | 10.00% | | $112,768.32 | 92 | $2,842.38 |
| TOTAL 1991 | | | | | | | $11,554.89 |
| | 01/01/92 | 03/31/92 | 9.00% | | $112,768.32 | 91 | $2,523.42 |
| | 04/01/92 | 06/30/92 | 8.00% | | $112,768.32 | 91 | $2,243.04 |
| | 07/01/92 | 09/30/92 | 8.00% | | $112,768.32 | 92 | $2,267.69 |
| | 10/01/92 | 12/31/92 | 7.00% | | $112,768.32 | 92 | $1,984.23 |
| TOTAL 1992 | | | | | | | $9,018.38 |
| | 01/01/93 | 03/31/93 | 7.00% | | $112,768.32 | 90 | $1,946.41 |

| PV# | PV Date | EOP | Rate | QTY | Base Amount | Days | Interest |
|---|---|---|---|---|---|---|---|
| | 04/01/93 | 06/30/93 | 7.00% | | $112,768.32 | 91 | $1,968.04 |
| | 07/01/93 | 09/30/93 | 7.00% | | $112,768.32 | 92 | $1,989.67 |
| | 10/01/93 | 12/31/93 | 7.00% | | $112,768.32 | 92 | $1,989.67 |
| TOTAL 1993 | | | | | | | $7,893.78 |
| | 01/01/94 | 03/31/94 | 7.00% | | $112,768.32 | 90 | $1,946.41 |
| | 04/01/94 | 06/30/94 | 7.00% | | $112,768.32 | 91 | $1,968.04 |
| | 07/07/94 | 09/30/94 | 8.00% | | $112,768.32 | 92 | $2,273.90 |
| | 10/01/94 | 12/31/94 | 9.00% | | $112,768.32 | 92 | $2,558.14 |
| Total 1994 | | | | | | | $8,746.50 |
| | 01/01/95 | 03/31/95 | 9.00% | | $112,768.32 | 90 | $2,502.53 |
| | 04/01/95 | 06/30/95 | 10.00% | | $112,768.32 | 91 | $2,811.48 |
| | 07/01/95 | 09/30/95 | 9.00% | | $112,768.32 | 92 | $2,558.14 |
| | 10/01/95 | 12/31/95 | 9.00% | | $112,768.32 | 92 | $2,558.14 |
| TOTAL 1995 | | | | | | | $10,430.30 |
| | 01/01/96 | 03/31/96 | 9.00% | | $112,768.32 | 91 | $2,523.42 |
| | 04/01/96 | 06/30/96 | 8.00% | | $112,768.32 | 91 | $2,243.04 |
| | 07/01/96 | 09/30/96 | 9.00% | | $112,768.32 | 92 | $2,551.15 |
| | 10/01/96 | 12/31/96 | 9.00% | | $112,768.32 | 92 | $2,551.15 |
| TOTAL 1996 | | | | | | | $9,868.77 |
| | 01/01/97 | 03/31/97 | 9.00% | | $112,768.32 | 90 | $2,502.53 |
| | 04/01/97 | 06/30/97 | 9.00% | | $112,768.32 | 91 | $2,530.34 |
| | 07/01/97 | 09/30/97 | 9.00% | | $112,768.32 | 92 | $2,558.14 |
| | 10/01/97 | 12/31/97 | 9.00% | | $112,768.32 | 92 | $2,558.14 |
| TOTAL 1997 | | | | | | | $10,149.15 |
| | 01/01/98 | 03/31/98 | 9.00% | | $112,768.32 | 90 | $2,502.53 |
| | 04/01/98 | 06/30/98 | 8.00% | | $112,768.32 | 91 | $2,249.19 |
| | 07/01/98 | 09/30/98 | 8.00% | | $112,768.32 | 92 | $2,273.90 |
| | 10/01/98 | 12/31/98 | 8.00% | | $112,768.32 | 92 | $2,273.90 |
| TOTAL 1998 | | | | | | | $9,299.52 |
| | 01/01/99 | 03/31/99 | 7.00% | | $112,768.32 | 90 | $1,946.41 |
| | 04/01/99 | 06/07/99 | 8.00% | | $112,768.32 | 68 | $1,680.71 |
| TOTAL 1999 | | | | | | | $3,627.12 |

| | |
|---|---|
| Total 1986 | $997.05 |
| Total 1987 | $4,460.19 |
| Total 1988 | $4,769.58 |
| Total 1989 | $4,869.12 |
| Total 1990 | $12,404.52 |
| Total 1991 | $11,554.89 |
| Total 1992 | $9,018.38 |
| Total 1993 | $7,893.78 |
| Total 1994 | $8,746.50 |
| Total 1995 | $10,430.30 |
| Total 1996 | $9,868.77 |
| Total 1997 | $10,149.15 |
| Total 1998 | $9,299.52 |
| Total 1999 | $3,627.12 |
| TOTAL INTEREST DUE | $108,088.88 |
| Damages—Offsets | $196,639.53 |
| TOTAL | $304,728.41 |